875 P.2d 894

**SENTINEL INSURANCE COMPANY, LTD., a Hawai'i corporation, Plaintiff–Appellee/Cross–Appellant,**

v.

**FIRST INSURANCE COMPANY OF HAWAI'I, LTD., a Hawai'i corporation, Defendant–Appellant/Cross–Appellee,**

and

˙Does 1–10, Defendants.

No. 16499.

Supreme Court of Hawai'i.

May 10, 1994.

As Amended on Grant of Reconsideration June 24, 1994.

Michele–Lynn E. Luke (Robert P. Richards, with her on the briefs, of Reid, Richards & Miyagi), Honolulu, for defendant-appellant/cross-appellee First Ins. Co. of Hawai'i, Ltd.

Arthur F. Roeca (Keith K. Hiraoka and Daniel T. Kim, with him on the briefs, of Roeca, Louie, & Hiraoka), Honolulu, for plaintiff-appellee/cross-appellant Sentinel Ins. Co., Ltd.

Daniel T. Kim of Roeca, Louie & Hiraoka, Honolulu, for Sentinel Ins. Co., Ltd., on the motion (for reconsideration).

Michele-Lynn E. Luke of Reid, Richards & Miyagi, Honolulu, for First Ins. Co. of Hawai'i, Ltd., on the answer (for reconsideration).

Before MOON, C.J., LEVINSON and NAKAYAMA, JJ., SOONG, Circuit Judge, in place of KLEIN, J., recused, and KAREN L. BLONDIN, Circuit Judge, in place of RAMIL, J., recused.

MOON, Chief Justice.

In this action for declaratory relief, defendant-appellant/cross-appellee First Insurance Company of Hawai'i, Ltd. (First Insurance) appeals from the circuit court's orders granting summary judgment in favor of plaintiff-appellee/cross-appellant Sentinel Insurance Company, Ltd. (Sentinel) wherein the court held that: (1) First Insurance breached its

contractual duty to defend its insureds; and (2) because of such breach, coverage [1] under its policies was conclusively presumed to have existed, thereby precluding First Insurance from litigating whether it had a duty to indemnify under its policies. Sentinel cross-appeals from the circuit court's denial of its motion for prejudgment interest.

We affirm the circuit court's ruling that First Insurance breached its duty to defend and the circuit court's rulings awarding fees and costs to Sentinel for First Insurance's breach and for bringing the declaratory relief action. However, we vacate the order declaring First Insurance liable for indemnification and remand this matter to the circuit court to allow First Insurance an opportunity to rebut the presumption of coverage. Consequently, we need not reach the merits of Sentinel's cross-appeal.

## I. BACKGROUND

The present dispute between the parties arose in connection with an underlying action, *Association of Apartment Owners of the Park at Pearlridge, et al. v. Honofed–Pacific, et al.*, Civil No. 86–2861, First Circuit Court, State of Hawai'i, filed on July 25, 1986. In the underlying action, the Association of Apartment Owners of the Park at Pearlridge (AOAO) alleged breach of contract, breach of warranty, and negligence claims against the developers and contractors of the apartment complex. The AOAO's claims were based on alleged defects in design, construction, and/or materials which caused, *inter alia*, water infiltration into the structure. Among the named defendants in the underlying action were Honofed–Pacific, a Hawai'i general partnership, and Honofed Development Corporation (collectively, the Honofed entities).[2] Faced with claims of liability for property damage, the Honofed entities tendered their defense to their then-insurer, Sentinel, the actual date of which is not apparent from the record. Sentinel defended the Honofed enti-

---

1. We note that, at times, the term "coverage" is utilized to refer to both the obligation to pay attorneys' fees and costs in defending a claim as well as the obligation to pay claims. As used in this opinion, "coverage" means "indemnification" or the obligation to pay claims.

2. In its complaint, the AOAO claimed that the Honofed entities were jointly and severally liable as the developers of the complex.

ties in the underlying action under a reservations of rights agreement.

The Honofed entities were continuously insured under comprehensive general liability (CGL) policies issued by either Sentinel or First Insurance as follows:

04/01/81 through 05/01/84—Sentinel

04/30/84 through 04/30/86—First Insurance

05/01/86 through 05/01/87—Sentinel

04/30/87 through 04/30/88—First Insurance

The construction of the Park at Pearlridge was completed in April 1981. The parties, however, disagreed as to when the property damage caused by the water infiltration first occurred. First Insurance maintained that the "structural damage in the way of water infiltration and associated damage became evident no later than December of 1982" while Sentinel claimed that "[t]he [AOAO] indicated ... that damage from the water infiltration ... began on or about December 11, 1984."

By letter dated November 16, 1987, Sentinel's Assistant Claims Manager, Michael E. Tymn, wrote to the Honofed entities:

As you are aware, [Sentinel] has been providing a defense for each of your organizations in [the underlying action].... Because the allegations and available facts concerning this matter were vague, we were unable to properly evaluate the coverage aspect. However, we now have more specific information on the damages being claimed.... Based upon this information, it now appears clear that much of the damage being claimed ... [is] not covered by the policy.... Further, since the damage appears to be ongoing, all liability carriers subsequent to [Sentinel] should be placed on notice and should share with [Sentinel] in the defense.

Tymn specifically referenced First Insurance. Upon being notified of Sentinel's position, First Insurance claims it requested further information from Sentinel, but Tymn did not respond. Accordingly, First Insurance "sought and received certain documents from counsel of record [in the underlying action] on March 16, 1988."

On July 11, 1988, First Insurance wrote to a representative of the Honofed entities and declared:

Although we have never received a written request from yourself to participate in the defense as outlined by Mr. Tymn, we will take this opportunity to state our position in light of Mr. Tymn's recent "demand," apparently made on your behalf.... First Insurance is, in fact, declining to participate in the defense of [the underlying action] as no coverage exists under its policies. First Insurance has not in the past, is not now[,] nor will it in the future "subscribe to a manifestation theory[3] on one case and an exposure theory[4] on another case, whichever suits [First] best" as Mr. Tymn alleges. Each coverage issue is individual and involves an analysis of both the policy and of the facts of the underlying case. Such an analysis was carried out in this case and discussed at length with personnel from First Insurance. The conclusion of First, based upon advice and concurrence of counsel, requires us to respectfully decline to participate in the defense of [the Honofed entities] as requested by Mr. Tymn.

Meanwhile, the parties in the underlying action settled all claims on November 22, 1988 and dismissed the action by stipulation on November 30, 1988. Sentinel and the Honofed entities jointly contributed $75,000.00 toward the settlement. Sentinel, additionally incurred $48,642.37 in attorneys' fees and costs in providing a defense in the underlying action.

Months later, First Insurance received a February 8, 1989 letter from Tymn wherein,

---

3. Under the manifestation theory, "[p]roperty damage ['Joccurs['] when the latent defect first manifests itself and the insurer on the risk at the time of first manifestation is [solely] liable for the entire loss, even if the property damage progresses after the policy expires." *Chemstar, Inc. v. Liberty Mut. Ins. Co.,* 797 F.Supp. 1541, 1548–49 (C.D.Cal.1992).

4. Under the "exposure theory," where exposure to a latent defect causes immediate damage that may not be immediately detectable, coverage is triggered each time the property is exposed to the damage-causing agent during the policy period. *TBG, Inc. v. Commercial Union Ins. Co.,* 806 F.Supp. 1444, 1452 (N.D.Cal.1990).

according to First Insurance, "Mr. Tymn was espousing an exposure theory of liability under which First [Insurance] may have owed a duty to defend claims in the underlying [action]." On February 27, 1989, First Insurance responded:

> we have reviewed and discussed the latest appellate decisions on point, decisions which in our opinion make it even more clear that in a property damage case the insurer on the risk at the time the damage was first discovered remains liable for the entire amount of property damage even though said damage may continue after the insurer's policy has expired.

Accordingly, First Insurance reaffirmed its declination to contribute to the defense costs.

On October 5, 1990, Sentinel filed the declaratory relief action, which is the subject of this appeal, in the First Circuit Court to establish First Insurance's liability for breach of its duties to defend and indemnify the Honofed entities in the underlying action. Sentinel sought contribution for monies paid in defense and settlement of the claims in the underlying action on behalf of itself and the Honofed entities.[5]

On August 9, 1991, Sentinel moved for summary judgment contending that: (1) First Insurance was obligated to defend the Honofed entities regarding the claims against them in the underlying action; (2) as a result of First Insurance's wrongful refusal to defend, Sentinel (individually and as assignee of the Honofed entities' claims) was entitled to recover the amounts paid in defending and settling the underlying action; (3) Sentinel was entitled to attorneys' fees and costs in bringing the declaratory relief action; and (4) Sentinel was entitled to prejudgment interest. On December 3, 1991, the circuit court granted summary judgment in favor of Sentinel on First Insurance's duty to defend. First Insurance moved for reconsideration of the court's ruling, which was

denied by written order filed on February 25, 1992.

Sentinel subsequently filed a second motion for summary judgment on January 31, 1992, seeking damages as follows:

1. 100% of the Honofed entities' contribution to the settlement of the underlying action, or $37,500.00;

2. 50% of Sentinel's contribution to the settlement of the underlying action, or $18,750.00;

3. 50% of the attorneys' fees and costs incurred by Sentinel to defend the Honofed entities in the underlying action, or $24,321.19;

4. Attorneys' fees and costs incurred by Sentinel in connection with the action for declaratory relief, or $27,621.84; and

5. An award of prejudgment interest under Hawai'i Revised Statutes (HRS) § 636–16.[6]

In opposition, First Insurance essentially argued that it should not be required to reimburse items (1) and (2) above because such requirement would be tantamount to holding that it had breached the duty to *indemnify* under the policy—an issue which had yet to be resolved.

On September 4, 1992, the circuit court, however, granted Sentinel's motion, awarding the amounts claimed, except for Sentinel's request for prejudgment interest.

First Insurance timely appealed the circuit court's orders of: (1) December 3, 1991, granting summary judgment in favor of Sentinel on the duty to defend issue; (2) February 25, 1992, denying First Insurance's reconsideration of the December 3 order; and (3) September 4, 1992, granting in part and denying in part Sentinel's second motion for summary judgment on the issue of damages. Sentinel timely cross-appealed that portion of the September 4, 1992 order denying its motion for prejudgment interest.

---

5. Sentinel was subrogated to and assigned all of the Honofed entities' rights arising out of First Insurance's refusal to defend.

6. HRS § 636–16 (1985) provides:
 In awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstance of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

## II. STANDARD OF REVIEW

■ On appeal, an order of summary judgment is reviewed under the same standard applied by the trial courts. Summary judgment is appropriate where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Kaneohe Bay Cruises, Inc. v. Hirata*, 75 Haw. 250, 258, 861 P.2d 1, 6 (1993); *State v. Magoon*, 75 Haw. 164, 175, 858 P.2d 712, 718, *reconsideration denied*, 75 Haw. ——, 861 P.2d 735 (1993).

## III. DISCUSSION

### A. Duty to Defend

#### 1. Sentinel's Motions for Summary Judgment

■ Because an insurer's duty to defend its insured is contractual in nature, we must look to the language of the policy involved to determine the scope of that duty. *Hawaiian Holiday Macadamia Nut Co. v. Industrial Indem. Co.*, 76 Hawai'i 166, 169, 872 P.2d 230, 233 (Sup.1994) (citing *Commerce & Industry Ins. Co. v. Bank of Hawai'i*, 73 Haw. 322, 325, 832 P.2d 733, 735, *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992)). The CGL policies issued by First Insurance, insuring the Honofed entities, provided in part:

> [First Insurance] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence, and [First Insurance] shall have the right and duty to defend any suit against the insured seeking damages on account of such ... property damage, even if the allegations are groundless, false or fraudulent....[7]

We have recognized that under this type of liability insurance policy, "the obligation to defend ... is broader than the duty to pay claims and arises wherever there is the mere *potential* for coverage." *Commerce*, 73 Haw. at 326, 832 P.2d at 735 (emphasis added)

(citations omitted). In other words, the duty to defend " 'rests primarily on the *possibility* that coverage exists. This possibility may be remote, but if it exists[,] the [insurer] owes the insured a defense.' " *Standard Oil Co. of California v. Hawaiian Ins. & Guar. Co., Ltd.*, 65 Haw. 521, 527, 654 P.2d 1345, 1349 (1982) (quoting *Spruill Motors, Inc. v. Universal Under. Ins. Co.*, 212 Kan. 681, 686, 512 P.2d 403, 407 (1973)) (emphasis added). "All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured[.]" *Trizec Properties, Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 812 (11th Cir.1985) (citing 7C Appleman, *Insurance Law & Practice*, 99–100 (Berdal ed. 1979)).

■ In order to determine whether First Insurance had a duty to defend in the context of the present case, we must examine whether the underlying action raised the possibility that the Honofed entities would be entitled to indemnification under any of the policies issued by First Insurance. Under those policies, First Insurance had a duty to indemnify if the Honofed entities became "legally obligated to pay ... damages because of property damage ... caused by an occurrence." According to the policies, an " 'occurrence' means an accident, including continuous or repeated exposure to conditions, which results in ... **property damage** neither expected nor intended from the standpoint of the **insured**." (Bold in original.) The policies define "property damage" as:

> (1) physical injury to or destruction of tangible property which occurs <u>during the policy period,</u> including loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** <u>during the policy period</u>.

(Bold in original.) (Underscoring added.)

■ Because coverage under the First Insurance policies is contingent upon an occurrence or accident resulting in property damage during each policy period, the policies are "occurrence" policies as opposed to

---

7. The language of the Sentinel policies is identical to the First Insurance policies in all relevant aspects.

"claims made" or "discovery" policies. An "occurrence policy" provides coverage if the event insured against (the "occurrence") takes place during the policy period, irrespective of when a claim is presented. Annotation, *Event as Occurring Within Period of Coverage of "Occurrence" And "Discovery" Or "Claims Made" Liability Policies*, 37 A.L.R. 4th 382, 390 (1985). Under a "claims made" or "discovery" policy, coverage is triggered by the presentation of a claim during the policy term regardless of when the event insured against took place. *Id.; see also Trizec*, 767 F.2d at 812 n. 3. The parties agree that, under an occurrence policy, the event that triggers potential coverage is the sustaining of actual damage by the complaining party and not the date of the act or omission that caused the damage. *Trizec*, 767 F.2d at 812; 11 *Couch on Insurance* 2d, § 44:8 at 194 (Rev. ed. 1982). Simply stated, the relevant focus under an occurrence policy is on the *effect*, not the *cause*.

Significantly, the complaint in the underlying action did not contain an allegation of *when* the property damage occurred. The complaint simply alleges in pertinent part:

18. After taking possession of the [condominium] [p]roject, [the AOAO] and the individual apartment owners and/or their successors in interest ascertained defects and inadequacies in the design and/or construction and/or materials of said [c]ondominium including but not limited to the following:

A. Water infiltration from walls and joint areas;

B. Water infiltration into units from windows;

C. Water infiltration and/or corrosion of post tension anchors and/or tendons;

D. Inadequate or defective concrete work;

E. Drywall partitions and joints;

F. Deviations from plans and/or specifications;

G. Related damage claims due to various water infiltration problems;

H. Other construction and/or design defects.

. . . .

22. By reason of the foregoing, [the AOAO] and the individual apartment owners have suffered resulting physical injury to or destruction of their tangible property or have suffered loss or diminution of use of their tangible property or have suffered economic loss or incurred out of pocket expenses, or have suffered other loss and damages.[8]

 Where the complaint does not address the crucial issue of whether the alleged property damage "occur[red][9] during the policy period,"

"[a]n insurer must look beyond the effect of the pleadings and must consider any facts brought to its attention or any facts which it could reasonably discover in determining whether it has a duty to defend. . . . The possibility of coverage must be determined by a good faith analysis of all information known to the insured or all information reasonably ascertainable by inquiry and investigation."

*Standard Oil*, 65 Haw. at 527, 654 P.2d at 1349 (quoting *Spruill Motors*, 212 Kan. at 686, 512 P.2d at 407). Thus, whether an insurer's refusal to defend was justified must be answered in light of the information available to the insurer at the time it made the refusal. *See Hawaiian Ins. & Guar. Co., Ltd. v. Blanco*, 72 Haw. 9, 17, 804 P.2d 876, 880 (1990).

First Insurance maintains that it conducted

a thorough investigation of claims asserted by the AOAO . . . which consisted in large part of reviewing documents provided by the AOAO's counsel of record . . . [that] established, beyond doubt, that water leakage and other damage, caused by structural defects, had manifested shortly after the complex was completed in 1981, but in no

---

8. Although the parties do not comment on the issue, we presume that only the Honofed entities' liability for negligence is relevant for coverage purposes in this case.

9. We note here that the word "occur" as used in the phrase "occurs during the policy period" within the meaning of "property damage" differs from an "occurrence."

event later than 1982. . . . The remaining documents reviewed by [First Insurance] showed that damages were continuing, through 1984 and through the time of [Sentinel's] "tender" of defense to [First Insurance].

Based on its investigation, the depth and scope of which is unclear from the record, First Insurance took the position that Sentinel's declaratory relief action was "without foundation" and moved for summary judgment, alleging that

[t]he property damage to the Park at Pearlridge occurred during SENTINEL's policy period, and well in advance of FIRST's policy period. As a basic rule of law, SENTINEL was the *only* insurer at risk at the time of loss, i.e., at the time damages became evident, and SENTINEL is therefore solely responsible for indemnifying the insureds.

First Insurance's position was based on several fundamental assumptions, namely, that: (1) the damages alleged in the underlying action actually became manifest no later than 1982; (2) the same damages, which admittedly continued into First Insurance's policy period, constituted a "single injury," that is, the loss was no longer a contingency or risk when its policy coverage began; (3) under a CGL occurrence policy, coverage is triggered by "manifestation of damages;" and (4) under a CGL occurrence policy, the insurer providing coverage at the time when the damage first manifests itself is solely responsible for the *entire* loss regardless of whether the duration of the loss continues and progresses into a period covered by another insurer's policy.

Although First Insurance's motion for summary judgment was denied, it maintained the identical position in opposing Sentinel's motion for summary judgment on the issue of the duty to defend. Likewise, on appeal, First Insurance remains committed to the same arguments, claiming that the circuit court erred in granting summary judgment in favor of Sentinel on the issue of First Insurance's duty to defend issue. We hold that the circuit court ruled correctly.

The record reflects that First Insurance attempted to establish that damages manifested themselves before its policy period began; however, that issue was but *one* of several operative assumptions that First Insurance has made. In order for the *potential* for coverage under First Insurance's policies to be considered non-existent, *all* of the operative assumptions made by First Insurance would have to be correct. For example, even assuming that the damages initially became manifested in 1982, if First Insurance was nonetheless wrong in concluding that it had no duty to indemnify the Honofed entities for damages continuing into its coverage periods, its entire argument with respect to its duty to defend collapses. Setting aside the factual questions involved, both of First Insurance's legal assumptions—that coverage is triggered by the manifestation of damages, and the insurer providing coverage at that time is solely responsible for the entire loss even though a portion of the loss extended into a period covered by another insurer—address issues unsettled in this jurisdiction.

No reported Hawai'i appellate court decision has dealt with the question whether coverage under a third-party insurance policy is triggered by a manifestation of loss theory of liability (manifestation theory). We note that the First Insurance policies at issue here are "third-party" policies as opposed to "first-party" policies. A "first-party" policy provides coverage for *loss or damage* sustained by the *insured* (.*e.g.*, life, disability, health, fire, theft, and casualty insurance) whereby the insurer usually promises to pay money to the insured upon the happening of the risk insured against. A "third-party" policy, on the other hand, provides coverage for the insured's *liability to another* (*e.g.*, CGL, directors' and officers' liability, and errors and omissions insurance) wherein the carrier generally assumes a contractual duty to pay judgments recovered against the insured arising from the insured's negligence. *See generally, Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395, 770 P.2d 704, 257 Cal.Rptr. 292 (1989).

First Insurance claims that a "plethora of caselaw" from other jurisdictions supports its contention that the manifestation theory triggers coverage in property damage cases.

However, as discussed subsequently in this opinion, there is a notable dispute nationwide over what trigger of coverage should apply in third-party liability insurance cases generally as well as what trigger should apply where the loss continues and progresses over successive policy periods involving different insurers. There is also significant conflict among jurisdictions regarding First Insurance's position that the "insurer on risk" at the time of manifestation is *solely* liable for the entire loss.

In particular, First Insurance relies on *Home Insurance Co. v. Landmark Insurance Co.*, 205 Cal.App.3d 1388, 253 Cal.Rptr. 277 (1988), *a first-party case*, for the proposition that the manifestation theory applies in this case; however, the California *third-party cases* following *Home Insurance* have been in conflict on this very issue. *Cf., e.g., Fireman's Fund Ins. Co. v. Aetna Cas. & Sur. Co.*, 223 Cal.App.3d 1621, 273 Cal.Rptr. 431 (1990) and *County Sanitation Dist. No. 2 of Los Angeles County v. Harbor Ins. Co.*, 17 Cal.App.4th 1622, 22 Cal.Rptr.2d 90, *reh'g granted*, September 16, 1993, with *Montrose Chemical Corp. v. Admiral Ins. Co.*, 20 Cal. App.4th 678, 5 Cal.Rptr.2d 358, *review granted*, 862 P.2d 661, 24 Cal.Rptr.2d 661 (1992) and *Stonewall Ins. v. Palos Verdes Estates*, 18 Cal.App.4th 1234, 9 Cal.Rptr.2d 663, *review granted*, 834 P.2d 1147, 11 Cal.Rptr.2d 329 (1992).[10] Consequently, the fundamental legal assumptions relied upon by First Insurance in refusing to defend the Honofed entities were not principles as settled as First Insurance deemed them to be.

▌ Thus, in order to determine whether First Insurance breached its duty to defend, we need not resolve the questions regarding (1) what event(s) triggered coverage in this case for property damage under the First Insurance policies, and (2) whether First Insurance and Sentinel may be jointly and severally liable for payment of those damages. The mere fact that the answers to those questions in this jurisdiction were not then and are not presently conclusively answered demonstrates that, based on the allegations in the underlying action, it was *possible* that the Honofed entities would be entitled to indemnification under the First Insurance policies. This is true even assuming that the damages as alleged in the underlying action first manifested themselves in 1982. Accordingly, we affirm the circuit court's December 3, 1991 order granting summary judgment in favor of Sentinel on the duty to defend issue.

### 2. First Insurance's Motion for Reconsideration

▌ First Insurance also contends on appeal that the circuit court erred in denying its motion for reconsideration of the December 3, 1991 order. We employ the abuse of discretion standard in reviewing the circuit court's denial of a motion for reconsideration. *Kaneohe Bay Cruises, Inc. v. Hirata*, 75 Haw. 250, 251, 861 P.2d 1, 3 (1993). The circuit court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. *Id.* Because we conclude that summary judgment on the duty to defend issue was proper and because First Insurance's motion for reconsideration did not present any new argument, but merely re-emphasized that it (First Insurance) had considered certain evidence that purportedly established that damages had become manifest in 1982 before rejecting the Honofed entities' defense, we conclude that the trial court did not abuse its discretion in denying the motion for reconsideration. *Cuba v. Fernandez*, 71 Haw. 627, 636, 801 P.2d 1208, 1213 (1990). We, therefore, affirm the circuit court's order denying the motion.

### B. *Duty to Indemnify*

First Insurance next challenges the circuit court's September 4, 1992 order granting summary judgment against it on the issue of indemnification. First Insurance argues that, even if it breached its duty to defend

---

**10.** Although the *Montrose* and *Stonewall* cases were not published until after First Insurance elected not to defend, the court in *Stonewall* confirmed that the prior relevant California decisions, some of which are cited by First Insurance, were hopelessly inconsistent. *See Stonewall*, 18 Cal.App.4th at 1252–53, 9 Cal.Rptr.2d at 671–72.

the Honofed entities in the underlying action, it should not have been foreclosed from disputing whether it had a duty to indemnify.

■ It is well settled that the duty to provide coverage and the duty to defend on the part of an insurer are separate and distinct. *See* 7C J. Appleman, *Insurance Law and Practice*, § 4681 (Berdal ed. 1979); *see also Doran v. Corn Products U.S.*, 776 F.Supp. 368, 374 n. 5 (N.D.Ill.1991) ("Insurer's duty to defend and its duty to indemnify an insured are two separate and distinct duties[.]"); *Oregon Ins. Guar. Assoc. v. Thompson*, 93 Or.App. 5, 11, 760 P.2d 890, 893–94 (1988), *review denied*, 307 Or. 303, 767 P.2d 443 (1989) ("An insurer's duty to defend is independent of, and not limited by, its duty to pay."); *First Ins. Co. of Hawai'i v. Continental Casualty Co.*, 466 F.2d 807, 811 (9th Cir.1972) (quoting *St. Paul Mercury Ins. Co. v. Huitt*, 336 F.2d 37, 44 (6th Cir. 1964)) (" 'the [contractual] obligation to defend is separate and distinct from the duty to provide coverage and to pay [a judgment].' ").

The parties dispute the application of the Intermediate Court of Appeals' (ICA) holding in *Standard Oil Co. of California v. Hawaiian Ins. & Guar. Co., Ltd.*, 2 Haw. App. 451, 634 P.2d 123 (1981), *aff'd*, 65 Haw. 521, 654 P.2d 1345 (1982). In *Standard Oil*,[11] three insureds, Standard Oil Company of California (SOCAL), Air Service Corporation (ASC) and Associated Aviation Activities (AAA), claimed that their insurer, Hawaiian Insurance & Guaranty Company, Ltd. (HIG), had breached its duty to defend them under a CGL policy and sought recovery of monies paid toward settlement and defense of the underlying suit. The underlying suit arose as a result of an airplane crash that claimed the life of the pilot and all five passengers. Investigation indicated that failure of the plane's left engine caused by contaminants in the fuel strainer of the engine caused or contributed to the crash. The engine had been fueled from an aviation refueler truck owned by SOCAL and apparently maintained to varying degrees by all three insureds. The truck was insured under a CGL policy, issued by HIG, which included coverage for negligent maintenance of the truck. If con-

taminants existed in the fuel, fuel strainers and other devices on the truck, if properly maintained, should have prevented contaminants from being pumped into the engine. Eventually, all three insureds were named as defendants in a consolidated action by the passengers' estates alleging various theories of negligence and products liability.

All three insureds tendered their defenses to HIG. HIG, however, declined the tenders and forwarded the actions to other insurers for defense, taking the position that the underlying suit was a products liability case for which no coverage existed under its CGL policy. After the underlying suit settled, the insureds sued HIG to recover the settlement amount, costs, and attorneys' fees. In that action, the insureds filed a series of summary judgment motions asserting that HIG had a duty to defend and indemnify. HIG opposed the motions, arguing, *inter alia*, that it had received late notice of the underlying actions. The trial court ruled that HIG had waived its claim of not being seasonably notified of the claims and held that HIG had breached its duty to defend. The court granted summary judgment against HIG for the defense and settlement costs, which it reduced by one-half pursuant to an "other insurance" clause in the HIG policy.

HIG appealed, arguing that the trial court erred in denying its claims that there was no timely notice and no coverage under the policy. *Standard Oil*, 2 Haw.App. at 459, 634 P.2d at 128. The ICA rejected the merits of the timeliness issue and agreed that HIG had breached its duty to defend. Then, in its only reference to HIG's argument that there was no coverage for the insureds' liability in the underlying suit, the ICA, citing *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 419 P.2d 168, 54 Cal.Rptr. 104 (1966), stated:

> [I]f a carrier refuses to defend when it has a duty to do so, it becomes liable for the expenses incurred in defense including attorney's fees by its insured and for the amount of any judgment or . . . for the amount of the settlements. *It cannot, having refused to defend, shift the burden of establishing whether the judgment or set-*

---

**11.** All further reference to *Standard Oil* shall be to the ICA decision, unless otherwise indicated.

*tlement was the result of the covered risk or a noncovered risk to the insured.*

*Id.,* 2 Haw.App. at 460, 634 P.2d at 129 (emphasis added). The ICA also held that the "other insurance" provision did not apply, reversed the trial court's decree awarding only half of the cross-appealing insured's settlement and litigation expenses, and remanded for entry of judgment for the full amount. This court granted certiorari for the sole purpose of determining whether the ICA erred in holding that HIG had been properly and seasonably notified as required by the policy and affirmed.[12] 65 Haw. 521, 654 P.2d 1345.

■■■ Sentinel maintains that under *Standard Oil,* an insurer that breaches its duty to defend is liable for any resulting settlement or judgment in the subject action and that it may not thereafter litigate whether such settlement or judgment was based on a covered risk. Essentially, Sentinel's position, with which the circuit court agreed, is that once the duty to defend is breached, the insurer's duty to indemnify is conclusively established in all cases. On the other hand, First Insurance argues that the ICA in *Standard Oil* merely held that when an insurer is determined to have breached its duty to defend, the insurer's obligation to indemnify the insured for liability incurred in the underlying suit is rebuttably presumed. In other words, according to First Insurance, the burden shifts to the insurer to negate coverage for the underlying liability.[13]

However, First Insurance's interpretation of *Standard Oil* is belied by the fact that the ICA in that case did not remand the matter to allow HIG to carry its purported burden

to negate coverage. First Insurance counters that "[b]ased on the facts of *Standard Oil* ... such a burden, whether placed on the insurer or the insured, would have been near impossible to establish with any degree of reasonable certainty." Thus, First Insurance essentially argues that the ICA ordered judgment to be entered against HIG on the coverage issue because it had implicitly determined that remanding the case for further proceedings would have been futile. We disagree.

First Insurance's interpretation of *Standard Oil* is implausible. Had the ICA decided to adopt the rule that the burden of proof regarding coverage under a policy shifts to the insurer after breaching its duty to defend, we are confident that the court would have explicitly made such a holding. Further, we note that there is absolutely no indication that the ICA elected not to remand the case because HIG's burden to negate coverage would have been "near impossible" to establish. There is simply no basis in the ICA's opinion to support First Insurance's interpretation.[14]

Moreover, although cited in *Standard Oil,* we note that *Gray* does not support the reasoning attributed to the ICA by First Insurance. *Gray* involved "an action by an insured against his insurer for failure to defend an action filed against him which stemmed from a complaint alleging that he had committed an assault." 65 Cal.2d at 266, 419 P.2d at 169, 54 Cal.Rptr. at 105. The insured, asserting self-defense, defended himself. The jury returned a verdict against the insured for $6,000 actual damages but refused to award any punitive damages. The

---

12. The ICA found that the pleadings forwarded to HIG by its insured indicated that "there was a potential liability for the covered risk (negligence in the maintenance of the truck, including loading and unloading)[.]" *Standard Oil,* 2 Haw. App. at 460, 634 P.2d at 129. Specifically, the complaint alleged that the insured was negligent and careless "in inspecting, servicing, maintaining and repairing the subject aircraft, and in failing to detect and remove blockages and obstructions to the flow of fuel into the engines[.]" *Id.* at 459, 634 P.2d at 128. This court held that "the pleadings did not have to specifically mention the refueler truck or establish that the refueler truck was the cause of the accident[,]" 65 Haw. at 527, 654 P.2d at 1349, and that the

allegations should have alerted HIG to the possibility of coverage under its policy. Because HIG had received a copy of the complaint more than eleven months before the scheduled trial, this court concluded that HIG was adequately and seasonably notified. *Id.*

13. Generally, the insured has the burden to prove that a loss is covered under the terms of the insurance policy. 21 J. Appleman, *Insurance Law & Practice* § 12093, at 15 (1980).

14. First Insurance also fails to explain why the indemnity issue would have been more difficult to determine on remand in *Standard Oil* than it would be in this case.

insurer asserted, *inter alia*, that it had no duty to defend because the complaint, on its face, alleged that the insured had committed assault, an intentional tort, which was not a covered claim under the policy.

The *Gray* court concluded that the insurer was obligated to defend, explaining that despite the allegations of intentional and wilful conduct there was a possibility that coverage existed because the plaintiff in the underlying action "could have amended his complaint to allege merely negligent conduct[,]" or the insured, in advancing his claim of self-defense, might have been able to show that he only engaged in nonintentional tortious conduct. *Id.* at 277, 419 P.2d at 177, 54 Cal. Rptr. at 113. The insurer attempted to distinguish the general rule that an insurer that wrongfully refuses to defend is liable on the judgment against the insured by arguing that the judgment in the underlying suit "[had] not necessarily been rendered on a theory within the policy coverage." *Id.* at 280, 419 P.2d at 179, 54 Cal.Rptr. at 115. In rejecting that argument, the court reasoned that to require the insured to establish "the extent of the loss caused by the insurer's breach ... would impose upon the insured [an] 'impossible burden[.]' " *Id.*

■■■ Several years later, the California Supreme Court clarified *Gray*. In *Hogan v. Midland National Ins. Co.*, 3 Cal.3d 553, 476 P.2d 825, 91 Cal.Rptr. 153 (1970), the California Supreme Court rejected the argument that an insurer, having breached its duty to defend, is precluded in all situations from later asserting the defense of non-coverage. In so doing, the court explained:

> We rejected such reasoning in [*Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co.*, 51 Cal.2d 558, 334 P.2d 881 (1959) ] stating "An insurer that has been notified of an action and refuses to defend on the ground that the alleged claim is not within the policy coverage is bound by a judgment in the action, in the absence of fraud or collusion, as to all material findings of fact essential to the judgment of liability of the insured. The insurer is not bound, however, as to issues not necessarily adjudicated in the prior action and can still present any defenses not inconsistent with

the judgment against the insured. * * * The issues that defendant litigated in the trial court and that are raised in this appeal concern the scope of policy coverage and were not adjudicated in the prior action." ... Statements in some cases to the effect that the judgment in the underlying action is conclusive as to the insurer's liability hold only that if factual matters upon which the issue of coverage turns are expressly or impliedly determined in the prior action such determinations bind the insurer in the subsequent suit to enforce the provisions of the policy.... [*Gray* ] is also distinguishable. We there held that an insurer which wrongfully refused to defend an action against the insured should be held liable for the amount of the judgment against its insured. It was not clear from the verdict in the prior action whether it was rendered on a theory within or without the policy's coverage. In answer to the insurer's contention that it should not be liable for the amount of the judgment because it was not necessarily rendered on a theory within the policy's coverage, we relied on the holding in [*Tomerlin v. Canadian Indem. Co.*, 61 Cal.2d 638, 394 P.2d 571, 39 Cal.Rptr. 731 (1964) ] that to require the insured to show the extent of the loss caused by the insurer's breach would cast an impossible burden on him. *Gray* therefore stands for the proposition that the insurer is liable whenever the trial in the underlying action involved a theory of recovery within the coverage of the policy and it was *not clear* whether the jury's verdict was based upon that theory. The present case is distinguishable because the issues upon which coverage depended were not raised in the [prior] action. Here it cannot be said that the court in the [prior] action could have impliedly determined the issues relating to coverage.

*Hogan*, 3 Cal.3d at 564–66, 476 P.2d at 832–33, 91 Cal.Rptr. at 160–61 (internal citations omitted).

■■■ The rule expressed in *Gray*, as clarified by *Hogan*, is based on the doctrine of collateral estoppel. As the Arizona Supreme Court has explained:

Under the doctrine of collateral estoppel, *the determination of a litigated fact or law which is essential to a valid and final judgment is conclusive between the parties or their privies in a subsequent claim.* Collateral estoppel applied between the insured and insurer is predicated upon an assumed identity of interests of the parties to the contract of indemnity in opposing the injured person's claim. Having been given the opportunity to appear on behalf of the insured in the tort suit to protect that common interest, the insurer will be bound by that judgment. The purpose of the doctrine is to combine two potential lawsuits—injured v. insured and injured or insured v. insurer—and dispense with the delay and expense of two trials on the same issue.

*Farmers Ins. Co. of Arizona v. Vagnozzi,* 138 Ariz. 443, 446, 675 P.2d 703, 706 (1983) (citations omitted) (emphasis added). Therefore, *Gray* did not support the ICA's holding that matters encompassed in the *settlement* of the underlying suit may not later be contested by the insurer. Settlement by definition avoids actual litigation of disputed issues. Consequently, where a case has been resolved by settlement, there is no basis to collaterally estop the insurer from challenging whether the underlying settlement was based on a covered claim. Under *Gray,* HIG should have been allowed in *Standard Oil* to contest coverage because there had been no adjudication that the insureds' alleged negligent maintenance of the truck caused the crash. However, the ICA's explicit instruction to remand solely for entry of judgment against HIG for the full amount lends support to the contention that the ICA conclusively presumed that coverage existed under HIG's policy based on its determination that HIG had breached its duty to defend. We therefore accept Sentinel's interpretation of *Standard Oil.*

Sentinel urges us to approve the ICA's holding in *Standard Oil* and affirm the circuit court's order granting summary judgment against First Insurance on the issue of indemnity. Notably, a fair number of juris-

dictions are in accord with this view and hold that an insurer in breach of its duty to defend is precluded from taking the position that the judgment or settlement did not involve a covered risk. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.,* 919 F.2d 235, 240 (4th Cir.1990) (applying North Carolina law and holding insurer could not litigate whether underlying events occurred during policy period); *Conanicut Marine Serv., Inc., v. Insurance Co. of N. Am.,* 511 A.2d 967 (R.I.1986); *Thornton v. Paul,* 74 Ill.2d 132, 23 Ill.Dec. 541, 384 N.E.2d 335 (1979); *Missionaries of Co. of the Mary, Inc. v. Aetna Cas. & Surety Co.,* 155 Conn. 104, 230 A.2d 21 (1967).[15] This rule has sometimes been referred to as the "Illinois rule," named after its most steadfast proponent. On the other hand, many other jurisdictions arduously adhere to the distinction between the duty to defend and the duty to indemnify and allow the insurer the opportunity to raise policy defenses post-breach of the duty to defend. *See, e.g., Polaroid Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 610 N.E.2d 912 (1993); *Servidone Constr. Co. v. Security Ins. Co.,* 64 N.Y.2d 419, 477 N.E.2d 441, 488 N.Y.S.2d 139 (1985); *Hirst v. St. Paul Fire & Marine Ins. Co.,* 106 Idaho 792, 683 P.2d 440 (Idaho Ct.App.1984); *Caldwell v. Allstate Ins. Co.,* 453 So.2d 1187 (Fla.App.1984); *Afcan v. Mutual Fire, Marine & Inland Ins. Co.,* 595 P.2d 638 (Alaska 1979); *Timberline Equip. Co., Inc. v. St. Paul Fire & Marine Ins. Co.,* 281 Or. 639, 576 P.2d 1244 (1978); *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Moore,* 349 So.2d 1113 (Ala.1977); *see also* 7C J. Appleman, *Insurance Law & Practice* § 4690, at 235–36 n. 19 (Berdal 1979) (citing cases).

We believe that the Illinois rule, which ignores the critical distinction between the duty to defend and the duty to indemnify, is far too broad. The logical basis for the rule is untenable—especially when it can be proven that no claim is covered by a given insurance policy—and its apparent public policy objectives can otherwise be achieved. In short, equity requires that the consequences of an insurer's breach of its duty to

---

15. Some of these jurisdictions allow an exception where the insurer would not have been permitted to participate in the defense because of a conflict of interest. *See, e.g., Thornton, supra.*

defend must be considered on a case by case basis. We therefore overrule the ICA's opinion in *Standard Oil* to the extent that it holds that a breach of the duty to defend results in an irrebuttable presumption that the insurer is obligated to indemnify its insured.

Inevitably, courts holding, as in *Gray,* that the insurer is precluded from litigating actual coverage have employed some form of waiver or estoppel rationale. The proffered bases for applying such a rule have included: (1) the insurer's failure to preserve the coverage defense by defending under a reservation of rights or seeking declaratory relief on its duty to defend, *see Vigilant Ins. Co.,* 919 F.2d at 240; *Reis v. Aetna Cas. & Surety Co. of Ill.,* 69 Ill.App.3d 777, 782, 25 Ill.Dec. 824, 828–29, 387 N.E.2d 700, 704–05 (1979); (2) the inequity of allowing the insurer to benefit from policy provisions and exclusions after the insurer has shirked its responsibilities thereunder, *Sims v. Illinois Nat'l Cas. Co.,* 43 Ill.App.2d 184, 193 N.E.2d 123 (1963); or (3) the similar inequity of allowing the insurer to second-guess the defense undertaken as a result of its breach. *Missionaries,* 155 Conn. at 114, 230 A.2d at 26. Arguably, the decisions applying this rule evince a policy concern that, without it, insurers might otherwise be encouraged to disavow their responsibility to defend "with everything to gain and nothing to lose." *See generally, Gray,* 65 Cal.2d at 280, 419 P.2d at 179, 54 Cal.Rptr. at 115 (citation and internal quotations omitted). There is little else to justify application of the rule in cases where there is no actual coverage and no waiver or estoppel has taken place.

However, a blanket application of coverage by waiver or estoppel, based upon the failure to provide a defense, subverts any meaningful distinction between the duty to defend and the separate duty to indemnify and, in many cases, serves no more than to punish the insurer for the breach of a contractual duty. In particular, New York's highest court, in rejecting such blanket application, emphasized:

> While it is well established that the insurer's obligation to furnish a defense is "heavy indeed, and, of course, broader than its duty to pay," the Appellate Division has in effect applied the same standard for both. By holding the insurer liable to indemnify on the mere "possibility" of coverage perceived from the face of the complaint—the standard applicable to the duty to defend—the court has enlarged the bargained-for coverage as a penalty for breach of the duty to defend, and this it cannot do.

*Servidone,* 64 N.Y.2d at 424, 477 N.E.2d at 444, 488 N.Y.S.2d at 142 (citations omitted). Also concerned with the penalty aspect of coverage by estoppel, the Idaho Court of Appeals has commented:

> We question the propriety of utilizing a form of estoppel as a punitive measure against an insurer for breach of a contractual duty to defend. Rather, we believe the sanctions for that breach should be governed by ordinary principles of contract law. In Idaho, the purpose of awarding damages for breach of contract is to fully recompense the non-breaching party for its losses sustained because of the breach, not to punish the breaching party.

*Hirst,* 106 Idaho at 799, 683 P.2d at 447 (citation omitted).

Further, we fail to see how there can be an estoppel in a case where the insurer refuses to defend by taking the position that there is no coverage under the policy and then maintains that same position in defending the insured's suit for indemnification. In that situation, "no estoppel is involved in any traditional sense because, in refusing to defend a claim, an insurer makes no misrepresentation on which the insured relies to its detriment." *Polaroid,* 414 Mass. at 763, 610 N.E.2d at 922 (citation omitted). Blanket application of coverage by waiver or estoppel, on the contrary, would result in the insured receiving a windfall. The insured would obtain a benefit it did not bargain for where the facts developed in discovery or at trial after the duty to defend has been breached establishes that the insured was not entitled to coverage. As one scholar of insurance has noted:

> Where there is no coverage, the greatest injury that the insured could have suffered by a failure to defend is the cost of de-

fense—the judgment would have been his responsibility regardless. [Courts holding to the contrary] apparently rel[y] on estoppel and ... breach of contract. Since the insured was in no way misled there could be no estoppel. A breach of contract of course waives a forfeiture but it does not nor should it create a new contract.

Appleman, *supra*, § 4689, at 215 n. 13.

■■■ Moreover, the need for an unconditional penalty in this context is questionable. Certainly, in individual cases, the application of waiver or estoppel will be appropriate—for example, where the insured has been prejudiced in some way by the insurer's failure to provide a defense, *see Polaroid*, 414 Mass. at 764, 610 N.E.2d at 922, or where the insurer has taken inconsistent positions with regard to defense and coverage. *See, e.g., Tomerlin v. Canadian Indem. Co.*, 61 Cal.2d 638, 394 P.2d 571, 39 Cal.Rptr. 731 (1964) (insured relinquished personal attorney's representation when agent for insurer represented that insurer was liable for coverage and would abandon reservation of rights). Further, as noted, the insurer will be collaterally estopped from re-litigating material factual findings actually or implicitly adjudicated in the underlying suit. *See Hogan*, 3 Cal.3d at 564, 476 P.2d at 832–33, 91 Cal. Rptr. at 160; *Polaroid*, 414 Mass. at 763 n. 20, 610 N.E.2d at 921 n. 20; *Vagnozzi*, 138 Ariz. at 446, 675 P.2d at 706 (collateral estoppel "operates to guarantee an insured the protection against lawsuits and legal liabilities for which he contracted").

However, in the absence of facts justifying waiver or estoppel, we agree with the reasoning of the New York and Idaho courts that precluding an insurer from proving it was, in fact, correct that there was no coverage under the policy merely because it was wrong in concluding there was no "possibility" of coverage would amount to no more than a punitive measure. Such an approach collapses the duty to indemnify into the duty to defend although the two duties are distinct in substance and scope.

■■■ Furthermore, courts are "disinclined" to enforce penalty provisions in contacts. 5 *Corbin on Contracts* § 1057, at 334 (1964) (liquidated damages functioning as a penalty for breach are impermissible in contract law). To the extent that the Illinois rule is concerned with irresponsible conduct, tort remedies are available and more appropriate in individual cases where the insurer's breach of contract is in bad faith. *See Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972) (recognizing cause of action for tortious breach of contract). Resort to tort concepts where fitting, rather than the regulatory estoppel penalty, preserves the traditional distinction between tort and contract remedies.

■■■ Finally, any justification for the rule based on the conception that the insurer gains an unfair advantage by its breach of contract is tenuous. To the contrary, the insurer that refuses to defend does so at its own peril. For example, the insurer forfeits any right to control the defense costs and strategy, including the right to compel the insured's cooperation in the defense of the claims; if it loses its claim of no duty to defend, it will be obliged to reimburse the insured for all reasonable defense fees and costs properly incurred. *See Arenson v. National Auto. & Cas. Co.*, 48 Cal.2d 528, 310 P.2d 961 (1957) (defaulting insurer liable for reasonable fees and costs properly incurred by insured in mounting constitutional challenge to statutory tort claim seeking $274.18 recovery despite insurer's objection to expense and vigor of defense). Additionally, the breaching insurer waives its right to approve of any settlement. *See Polaroid*, 414 Mass. at 765, 610 N.E.2d at 922. Under such circumstances, the insured is entitled to negotiate a reasonable and good faith settlement of the underlying claim which amount may then be utilized as presumptive evidence of the breaching insurer's liability. *Isaacson v. California Ins. Guar. Ass'n.*, 44 Cal.3d 775, 791, 750 P.2d 297, 308, 244 Cal.Rptr. 655, 666 (1988). Thus, by refusing to provide a defense, the insurer risks liability for a settlement in an amount that, although reasonable, could be higher than it might have been able to secure. *Polaroid*, 414 Mass. at 765, 610 N.E.2d at 922. The same type of danger is inherent in a verdict rendered at trial.

In sum, fairness to both parties requires that the equities be balanced in each case. We, therefore, adopt the view of the Supreme Judicial Court of Massachusetts in *Polaroid* and hold that where the insured seeks indemnification after the insurer has breached its duty to defend, (1) coverage is rebuttably presumed, (2) the insurer bears the burden of proof to negate coverage, and (3) where relevant, the insurer carries its traditional burden of proof that an exclusionary clause applies. *See Polaroid,* 414 Mass. at 765 n. 22, 610 N.E.2d at 922 n. 22.

The record in the present case does not contain evidence sufficient to establish that First Insurance waived or should be estopped from taking the position that it was not obligated to indemnify the Honofed entities for liability incurred in the underlying action. Accordingly, we vacate parts one and two of the September 4, 1992 order granting summary judgment in favor of Sentinel on First Insurance's liability for indemnification and remand this matter to the circuit court to allow First Insurance an opportunity to rebut the presumption that it is liable under its policies to indemnify Sentinel (individually and as the subrogree of the Honofed entities). However, we affirm the award of fees and costs to Sentinel for First Insurance's breach of the duty to defend and for bringing the declaratory relief action.

### C. *Issues on Remand*

We now address issues that we anticipate will arise on remand, deciding first what event triggers coverage under a CGL occurrence type policy for continuous and progressive property loss.

As previously noted, the First Insurance and Sentinel policies provided indemnification for "occurrences" that, *inter alia,* resulted in "physical injury to or destruction of tangible property which occurs during the policy period." In latent defect cases, however, the date when the property damage occurs is often difficult, if not impossible, to pinpoint. Thus, several analytical theories— such as the manifestation of loss theory, the exposure theory, and the injury-in-fact theory—have been developed to guide courts in making the determination of when damage "occurs," thereby triggering coverage.

Under the "manifestation of loss" trigger, "[p]roperty damage [']occurs['] when the latent defect first manifests itself, and the insurer on the risk at the time of first manifestation is [*solely* ] liable for the entire loss, even if the property damage progresses after the policy expires." *Chemstar, Inc. v. Liberty Mut. Ins. Co.,* 797 F.Supp. 1541, 1548–49 (C.D.Cal.1992) (citation omitted). Property damage "manifests" at " 'that point in time when appreciable damage occurs and is or should be known to the insured.' " *Id.* at 1549 (quoting *Prudential–LMI Commercial Ins. v. Superior Court,* 51 Cal.3d 674, 699, 798 P.2d 1230, 274 Cal.Rptr. 387 (1990)). Thus, coverage is triggered upon manifestation.

The "exposure theory" of liability was crafted in asbestos cases based on the phenomenon that asbestos lung disease progresses slowly without symptoms for many years before detected. However, because scar tissue forms within a short period of time after inhalation, courts, in what has been suggested to be an effort to maximize coverage for the afflicted,[16] have deemed each exposure to asbestos (resulting in a separate deposit of scar tissue)[17] to be a separate occurrence of bodily injury in a continuing tort. *See Home Ins. Co. v. Landmark Ins. Co.,* 205 Cal.App.3d 1388, 1395, 253 Cal.Rptr. 277, 281 (1988). Therefore, in cases where exposure to a latent defect causes *immediate* damage (although not immediately *detectable* ), this theory has been employed and coverage is triggered each time person or property is exposed to the damage causing agent during the policy period. *TBG, Inc. v. Commercial Union Ins. Co.,* 806 F.Supp. 1444, 1452 (N.D.Cal.1990)

---

**16.** *See* Developments in the Law, *Toxic Waste Litigation: Bankruptcy and Insurance Issues,* 99 Harv.L.Rev. 1458, 1579–81 (1986).

**17.** The medical conclusion that physical injury occurs with each exposure to asbestos has been supported by expert testimony. *See Harford County v. Harford Mut. Ins. Co.,* 327 Md. 418, 430, 610 A.2d 286, 292 (1992) (citing *Mitchell v. Maryland Cas. Co.,* 324 Md. 44, 595 A.2d 469 (1991)).

(citations omitted). For example, the exposure theory has been applied more recently in environmental toxic tort cases. *See id.* at 1453. (holding that the exposure theory should apply where property was damaged immediately each time a hazardous contaminant was released into a field).

■ An "injury-in-fact" trigger has also emerged, whereby coverage is triggered by the actual occurrence during the policy period of an injury-in-fact. *American Home Prod. Co. v. Liberty Mut. Ins. Co.,* 748 F.2d 760, 763 (2d Cir.1984). Under this trigger, an injury occurs whether detectable or not; in other words, an injury need not manifest itself during the policy period, as long as its existence during that period can be proven in retrospect. *See Abex Corp. v. Maryland Cas. Co.,* 790 F.2d 119, 121, 124–25 (D.C.Cir. 1986). As we shall discuss, the injury-in-fact trigger differs from the exposure theory when exposure to a damage-causing agent does not simultaneously result in injury.

■ Particular difficulty has been encountered when an injury process is not a definite, discrete event—for example, where the damage continues progressively over time spanning different insurer's policy terms. In this situation, courts have invoked an equitable "continuous injury" trigger of coverage. Under this theory, property damage is deemed to have "occurred" continuously for a fixed period (the "trigger period"), and every insurer on the risk at any time during that trigger period is jointly and severally liable to the extent of their policy limits, the entire loss being equitably allocated among the insurers. *See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 817 F.Supp. 1136, 1153 (D.N.J.1993); *Chemstar,* 797 F.Supp. at 1549; *TBG, Inc.,* 806 F.Supp. at 1452; *see generally California Union Ins. Co. v. Landmark Ins. Co.,* 145 Cal.App.3d 462, 476–78, 193 Cal.Rptr. 461, 469–71 (1983). The trigger period begins with the inception of the injury and ends when the injury ceases. *Chemstar,* 797 F.Supp. at 1549. Before the continuous injury trigger may be applied, the party urging its application must make two factual showings. It must be established that: (1) some kind of property damage occurred during the coverage period of each policy under which recovery is sought; and (2) the property damage was part of a continuous and indivisible process of injury. *Chemical Leaman,* 817 F.Supp. at 1153–54.

There is a significant divergence of opinion nationwide with no consensus view on which theory should be applied in the third-party liability insurance context. Indeed, several courts have concluded that the only universal theme that may be drawn from the legion of cases is that the terms of the policy and the nature of the injury must be examined in each case to determine the appropriate trigger theory. *TBG, Inc.,* 806 F.Supp. at 1452; *Trustees of Tufts Univ. v. Commercial Union Ins. Co.,* 415 Mass. 844, 854–55, 616 N.E.2d 68, 75 (1993); *see also Gottlieb v. Newark Ins. Co.,* 238 N.J.Super. 531, 538, 570 A.2d 443, 447 (1990).

■ In this case, First Insurance maintains that the manifestation trigger applies, and thus, Sentinel is solely liable for the loss because damage at the Park at Pearlridge manifested in 1982—during Sentinel's policy period. Although Sentinel has taken the position that First Insurance is estopped from litigating the indemnity issue, it has argued alternatively that the continuous injury trigger applies. We reject First Insurance's argument and adopt the injury-in-fact trigger for all standard CGL policies. As discussed below, the injury-in-fact trigger is compelled by the plain language of the policies, and it does not violate the objectively reasonable expectations of the parties or relevant policy considerations.

■ Initially, we "must respect the plain terms of the [insurance] policy and not create ambiguity where none exists." *Smith v. New England Mut. Life Ins. Co.,* 72 Haw. 531, 537, 827 P.2d 635, 638 (1992) (citation omitted). Likewise, relevant contractual terms must be construed as they are written where two insurance companies dispute coverage. *Continental Ins. Co. v. Highlands Ins. Co.,* 793 F.2d 225, 226 (9th Cir.1986). Viewing the policies in their entireties, we agree that the injury-in-fact trigger is the only theory of coverage consistent with the plain language of the policies. *See American*

*Home Prod. Co. v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485, 1497 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2d Cir.1984). As one court has noted in rejecting the manifestation trigger for CGL policies:

> Nothing in the language of the policies requires that the claimed property damage be discovered or manifested during the policy period. The inquiry instead, is whether the property damage, as defined in the policies, "occurred" within the policy period and within the meaning of the term "occurrence." Indeed, the very nature of an "occurrence" as opposed to a "claims-made" policy is to provide coverage for property damage that occurred during the policy period whenever that liability is imposed.

*Tufts*, 415 Mass. at 853, 616 N.E.2d at 74 (citations omitted); *accord Harford County v. Harford Mut. Ins. Co.*, 327 Md. 418, 434–35, 610 A.2d 286, 294 (1992); *TBG, Inc.*, 806 F.Supp. at 1453; *Trizec*, 767 F.2d at 813. Further, other courts have found the exposure theory inconsistent with the policy language unless exposure produces an immediate injury. *American Home*, 565 F.Supp. at 1493. Where the policy language admits of only one reasonable interpretation, the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the contract's meaning. *American Home*, 748 F.2d at 765.

Although we need not consider extrinsic evidence when the disputed policy language is unambiguous, we note that the injury-in-fact trigger serves the objectively reasonable expectations of the insurers. The coverage language of the First Insurance and Sentinel policies is drawn from a standard form CGL policy. *See generally*, R. Long, *The Law of Liability Insurance* § 10.04 (1993). In support of its plain meaning analysis, the *American Home* court presents a highly persuasive argument that the drafters of the standard form CGL policies specifically rejected language that would have incorporated the manifestation or exposure triggers into the CGL policy, contemplating instead that coverage would be afforded only for injuries shown in fact to have occurred during the period of coverage. 565 F.Supp. at 1500–03. With regard to the history and purpose of the CGL, the court noted:

> The CGL evolved out of the difficulties faced by courts and parties in dealing with personal injuries and property damage sustained as a result of gradual processes. Prior to 1966, general liability policies covered liability "because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, *caused by accident* and arising out of the hazards hereinafter defined." The word "accident" suggested an intent to cover only sudden, unexpected, but identifiable events. The courts were left in doubt as to whether, and to what extent, the standard policy was meant to cover liability for injuries that resulted from gradual processes, rather than from sudden events.
>
> The insurance industry responded to the uncertainty created by the "accident" orientation of the pre–1966 liability policies by creating a task force to draft what eventually became the CGL. In 1960, The Mutual Insurance Rating Bureau ("Mutual") and the National Bureau of Casualty Underwriters ("National") established several committees, which engaged in the revision process.... The task force substituted the "occurrence" approach now in the CGL ... policies for the "accident" approach, and it expressly provided that an occurrence included any injury or damage that resulted, not only from an accident, but also from injurious exposure over an extended period....
>
> The new CGL failed, however, to resolve definitively the time injury should be found to occur in insidious disease cases. The CGL, like its predecessor, requires only that an injury take place during the coverage period. But, since the injuries expressly covered under the CGL include those resulting from long-term injurious exposure, the difficulty of determining time of injury was certain to be even greater under the CGL than it had been under predecessor policies. The insurance industry task force recognized this problem from the very outset of its labors, just as courts had recognized by then that an injury could occur in scientific fact long

before it became manifest. Nevertheless, the task force refused to alter the standard policy language to define precisely the time of injury; in the process, moreover, they refused to accept language that would have incorporated into the CGL either the manifestation or the exposure theory.

*Id.* at 1500–01 (internal citations omitted) (emphasis in original); *accord Montrose Chemical Corp. v. Admiral Ins. Co.*, 20 Cal. App.4th 678, 696, 5 Cal.Rptr.2d 358, 369, *review granted,* 862 P.2d 661, 24 Cal.Rptr.2d 661 (1992) ("the drafters of the [standard CGL] 'occurrence' policy and experts advising the industry regarding its interpretation contemplated coverage under successive policies for progressive continuing injuries and damage").

Because publications alerted the insurance industry that coverage under more than one policy may be possible under the standard form CGL for progressive damage, *see American Home,* 565 F.Supp. at 1502 (quoting Elliot, *The New Comprehensive General Liability Policy,* in Liability Insurance Disputes 12–5 (S. Schreiber ed. 1968)); *Montrose,* 20 Cal.App.4th at 695–96, 5 Cal.Rptr.2d at 368–69, the only reasonable expectation that an insurer utilizing the standard form language without significant deviation may have is that coverage is triggered by sustaining an injury-in-fact.

Furthermore, the injury-in-fact theory subsumes the manifestation and exposure theories in many cases such as the case at bar. In other words, the manifestation and exposure theories will be the practical equivalent of the injury-in-fact trigger in particular cases. *American Home,* 565 F.Supp. at 1509. In *Chemstar,* for example, twenty-eight southern California homeowners asserted claims against Chemstar when the plaster on their interior walls pitted, leaving "unsightly blemishes." Considering the nature of the injury, the court noted that "plaster-pitting is a type of cosmetic rather than structural damage, since it does not affect the stability or the soundness of the homes themselves." 797 F.Supp. at 1544–45. Accordingly, the court concluded that "since the plaster-pitting was cosmetic rather than structural damage, no damage occurred until

the pitting manifested, thereby disfiguring the plaster." *Id.* at 1550. Thus, injury-in-fact was equivalent to manifestation. Likewise, in toxic tort and asbestos cases, evidence may indicate that injury-in-fact is simultaneous with exposure. *See TBG, Inc.,* 806 F.Supp. at 1453; *Harford County,* 327 Md. at 430, 610 A.2d at 292 (citing *Mitchell* ). Thus, the injury-in-fact trigger diverges from the manifestation and exposure theories only when injury-in-fact is not simultaneous with manifestation or exposure.

■ The injury-in-fact trigger is therefore true to the terms of the CGL policy and suitable for any type of injury. However, where injury-in-fact occurs continuously over a period covered by different insurers or policies, and actual apportionment of the injury is difficult or impossible to determine, the continuous injury trigger may be employed to equitably apportion liability among insurers. *See Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1392 (E.D.N.Y.1988).

■ Finally, we do not perceive any public policy considerations counseling against enforcement of the plain language of the policies. Although the determination of when injury-in-fact occurs may be a difficult task requiring expert scientific evidence in certain cases, proof of the actual onset of injury with precision is not necessary; "all that is necessary is reasonably reliable evidence that the injury ... more likely than not occurred during a period of coverage, which usually is at least one year long[.]" *American Home,* 565 F.Supp. at 1509. Nevertheless, however potentially difficult the fact-finding task may be, we cannot rewrite the plain terms of the policy. *See Fortune v. Wong,* 68 Haw. 1, 11, 702 P.2d at 299, 306 (1985) ("a court 'cannot rewrite the contract of the parties' ") (citation omitted).

We also recognize that the injury-in-fact trigger may provide less predictability than the manifestation trigger for insurance companies in setting policy reserves. We simply observe that CGL occurrence policies were not designed for optimizing predictability in establishing reserves. As the *Montrose* court cogently observed,

application of the "manifestation of loss" rule to a CGL "occurrence" policy would transform it into a "claims made" policy. "Claims made" coverage was developed to limit a carrier's risk by restricting coverage to the single policy in effect at the time when a claim was asserted against the insured, thus permitting the carrier to establish reserves without regard to the possibilities of inflation, upward-spiraling jury awards or enlargements of tort liability after the policy period. "Claims made" and other "discovery" policies thus beneficially permit insurers to more accurately predict the limits of their exposure and the premium needed to accommodate the risk undertaken, resulting in lower premiums than are charged for an "occurrence" policy.

To read an occurrence policy to afford coverage only when the injury or damage becomes manifest during the policy period and thus to preclude coverage under successive policies—notwithstanding that the insured has paid a premium higher than that which would have been charged for a "claims made" policy—unfairly transforms the more expensive occurrence policy into a cheaper claims made policy.

20 Cal.App.4th at 694–95, 5 Cal.Rptr.2d at 367–68 (internal citations omitted); *accord Stonewall Ins. v. Palos Verdes Estates,* 18 Cal.App.4th 1234, 1254, 9 Cal.Rptr.2d 663, 673, *review granted,* 834 P.2d 1147, 11 Cal. Rptr.2d 329 (1992).

In the present case, the record contains allegations that property damage to the apartment complex resulting from the Honofed entities' negligence began to occur shortly after completion of the complex in 1981 and continued at least until settlement of the underlying action in 1988. Applying the injury-in-fact trigger, First Insurance and Sentinel were obligated to indemnify the Honofed entities only for liability incurred

for damages to the complex that in fact occurred during their respective policy periods. Thus, on remand, First Insurance will remain liable to indemnify Sentinel in the amount of $56,250.00—that is, the entire amount paid in settlement of the underlying action ($75,000.00) minus the amount for which Sentinel admits it is liable ($18,750.00)[18]—unless it can prove that a lesser amount of damage in fact occurred during its policy periods.

We hold, however, that if First Insurance cannot establish with reasonable certainty which damages had occurred during its policy periods, the continuous injury trigger will apply because Sentinel and First Insurance both agree that the loss in the underlying action progressed continuously. Sentinel, in its motion for summary judgment, also admits that "discovery conducted in the underlying case revealed that cracking in the concrete portions of the building [was] observed in 1982." Thus, the trigger period began during Sentinel's first policy period. Further, the written settlement offer in the underlying action, upon which First Insurance has relied in arguing that damage commenced as early as 1982, also establishes that damage continued to at least 1984–85, which First Insurance does not deny. Consequently, First Insurance's first policy was also triggered. However, the record is insufficient to establish whether the damage continued at any time during Sentinel's and First Insurance's second policy periods. The circuit court therefore must determine whether damage in fact continued to occur during Sentinel's and First Insurance's second policy periods, thereby triggering each policy.

When it is finally determined which policies were triggered, the liability for the total loss, according to the continuous injury trigger, must be equitably apportioned between Sentinel and First Insurance. The

**18.** Sentinel seeks recovery of only fifty percent of the money it contributed to settlement based on its conclusion that the "other insurance" provision of its policies apply. However, under the injury-in-fact trigger, Sentinel's and First Insurance's policies were triggered at the same time only on April 30, 1984, April 30, 1986, and April 30, 1987—the only days on which Sentinel's and First Insurance's policy periods overlapped. *See*

*Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1393 (E.D.N.Y.1988) (under injury-in-fact trigger, "each injury is discrete and must be assignable to a separate policy, so, by definition, no losses could be covered by both policies"). Nonetheless, by conceding that it was liable to indemnify the Honofed entities in the amount of $18,750.00, Sentinel has waived any argument to the contrary.

total loss in this case is $75,000.00—the amount paid in settlement of the underlying action by or on behalf of the Honofed entities. Equity, under the circumstances of this case, dictates that the court allocate contribution among the liable insurers in proportion to the time periods their policies covered.[19] *See Uniroyal,* 707 F.Supp. at 1393; Developments in the Law, *Toxic Waste Litigation: Bankruptcy and Insurance Issues,* 99 Harv. L.Rev. 1458, 1579–81 (1986). In this case, for example, Sentinel's and First Insurance's policies insured the Honofed entities from April 1, 1981 through April 30, 1988, or eighty-five months. Assuming the damage to the apartment complex progressed throughout that entire period—that is, for a trigger period of eighty-five months—Sentinel would be liable for 57.6%[20] of the total loss, or $43,235.29, and First Insurance would be liable for 42.4%[21] of the total loss, or $31,764.71. Of course, these figures may change if a shorter trigger period is determined on remand.[22]

◼ Finally, First Insurance has raised the argument that its potential liability for the Honofed entities' loss in this case may be limited by the "loss-in-progress" rule. The loss-in-progress rule is a variant of the "known loss" (also referred to as the "known risk") rule. *Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co.,* 997 F.2d 172, 177 (6th Cir.1993). "The known loss rule is based on the fundamental principle [of insurance law] that insurance is intended to cover risks [or contingencies] which are not definitely known to the insured." *Continental Ins. Co. v. Beecham Co.,* 836 F.Supp. 1027, 1046 (D.N.J.1993); *see* HRS § 431:1–201 (1987) ("[i]nsurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies"). Under the known loss rule, "a loss [is] uninsurable . . .

when the insured knew or should have known that there was a substantial probability of loss before the [policy] period began." *CPC Int'l, Inc. v. Aerojet–General Corp.,* 825 F.Supp. 795, 809 (W.D.Mich.1993). The loss-in-progress rule, on the other hand, provides that "one cannot insure [against] a loss that is already in progress." *Beecham,* 836 F.Supp. at 1046. Accordingly, the loss-in-progress rule precludes insurance coverage where the insured is or should be aware of an ongoing progressive loss at the time the policy is purchased. *Inland Waters,* 997 F.2d at 176 (citation omitted). Thus, both rules operate only where the insured was or should have been aware that a loss had occurred before coverage began. The only apparent difference between the two is that the known loss rule operates where the loss has occurred before the policy period commences while the loss-in-progress rule applies when the loss is imminent or still occurring when the policy becomes effective.

◼ Relying on the loss-in-progress rule, First Insurance argues that insurance under its policies is precluded if the damage to the apartment complex commenced before its policies became effective. However, First Insurance misapprehends the critical distinction between the contingencies insured against under first- and third-party insurance policies. In the first-party insurance context, the contingency insured against is injury to the insured's own person or property; in the third-party insurance context, however, the contingency insured against is the risk of *liability* to another for personal or property injury. *Montrose,* 20 Cal.App.4th at 700, 5 Cal.Rptr.2d at 371. Thus, under a first-party homeowner's insurance policy, for example, once physical injury to the insured home occurs, the contingency has arisen. *Snapp v. State Farm Fire and Cas. Co.,* 206

---

**19.** Neither party alleges that their potential liability in this case could exceed the policy limits on indemnification coverage under any relevant policy.

**20.** Sentinel's policies were in effect for forty-nine months of the eighty-five month trigger period, or 57.6%.

**21.** First Insurance's policies were in effect for thirty-six of the eighty-five month trigger period, or 42.4%.

**22.** We note here that because Sentinel seeks recovery of only fifty percent of the $37,500.00 it contributed towards the settlement, the maximum liability of First Insurance on remand with respect to the total settlement amount is $56,-250.00.

Cal.App.2d 827, 24 Cal.Rptr. 44 (1962). On the other hand, under a third-party CGL policy, an insured's *liability* for causing the same injury to the home may remain uncertain, that is, contingent, for a significantly longer time after the actual damage has occurred.

■ Here, the contingency insured against under the First Insurance and Sentinel policies concerned the Honofed entities' liability for the damage that occurred at the apartment complex, not the damage itself. We note that the underlying action was filed against the Honofed entities before First Insurance's second policy became effective; however, the record is unclear as to when the Honofed entities were served with the complaint. In this context, some courts have indicated that there may no longer be a contingency under a third-party policy after an injured third-party files a lawsuit or claim against the insured alleging liability for which the insured would be entitled to indemnification under the terms of the policy. *See Montrose*, 20 Cal.App.4th at 700, 5 Cal. Rptr.2d at 371; *Stonewall*, 18 Cal.App.4th at 1261, 9 Cal.Rptr.2d at 677. However, this assumes that the insured's liability as alleged in the lawsuit or claim is a certainty. Otherwise, if the insured's liability is in any degree contingent, there is an insurable risk.[23] The point at which a threat of loss is so immediate that it may fairly be said that the loss was in progress and the insured knew of it at the time the policy was applied for or issued is generally a question of fact. *Inland Waters*, 997 F.2d at 178.

Accordingly, the point at which the Honofed entities' liability for the damages to the apartment complex was no longer a contingency is a question of fact to be determined on remand.[24] The resolution of this issue may affect the equitable allocation of the loss if the continuous injury trigger is applied, that is, the period during which the respec-

tive insurers' coverage was effective may be altered.

### D. *Prejudgment Interest*

■ On cross-appeal, Sentinel claims that the circuit court erred in denying prejudgment interest on its damages from the date of settlement in the underlying action. "Prejudgment interest, where appropriate, is awardable under HRS § 636-16 in the discretion of the court." *Schmidt v. Board of Directors of the Ass'n of Apartment Owners of The Marco Polo Apartments*, 73 Haw. 526, 533, 836 P.2d 479, 483 (1992) (citation omitted). We note that in denying Sentinel's request, the circuit court stated:

> [O]ne of the reasons the insurance company who fails to defend is liable for the damages that you've asserted *is to some degree punitive. It bars the non-defending insurance company from coming in and arguing later on about contribution and about settlements where they would otherwise have a defense. [¶] And under the circumstances of this case, I deny prejudgment interest.*

(Emphasis added.) Because First Insurance, on remand, will have the opportunity to rebut the presumption of coverage, any damages that may be awarded against it will not be punitive in nature. Therefore, we need not consider the merits of Sentinel's cross-appeal. On remand, Sentinel is free again to request prejudgment interest.

### IV. *CONCLUSION*

Based on the foregoing, we affirm the circuit court's December 3, 1991 order, vacate its September 4, 1992 order except the awards of fees and costs of $24,321.19 incurred by Sentinel for defending the underlying action and $27,621.84 incurred in connection with the declaratory relief action, and

---

**23.** "The degree of risk is a matter left to the parties in establishing[,] after appropriate disclosure[,] the premium paid to transfer the risk." *Stonewall*, 18 Cal.App.4th at 1262, 9 Cal.Rptr.2d

■

**24.** We note that First Insurance has not alleged that the Honofed entities materially misrepresented any fact concerning the underlying action on its application for insurance; nor has First Insurance alleged that the loss in the underlying action was not an "accident" for purposes of the policies' definition of occurrence.

remand this matter to the circuit court for proceedings as set forth in this opinion.