**20-3559-cv**
*The Insurance Company of the State of Pennsylvania v. Equitas Insurance Limited*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2022

Argued: December 1, 2022     Decided: May 22, 2023

Docket No. 20-3559-cv

THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,

*Plaintiff-Appellee,*

— v. —

EQUITAS INSURANCE LIMITED,

*Defendant-Appellant.*

Before:

CALABRESI, LYNCH, and NARDINI, *Circuit Judges.*

Defendant-Appellant, a reinsurer, appeals from an order of the Southern District of New York (Swain, *C.J.*) granting summary judgment to Plaintiff-Appellee, its reinsured. On appeal, Appellant argues that the district court

erroneously held that its reinsurance obligations to Appellee are co-extensive with Appellee's separate insurance obligations to a third party and that it presented no triable issue of fact on its late-notice defense. We disagree. The district court correctly determined that English law, which governs the relevant reinsurance policy, would interpret that policy to provide coverage that is co-extensive with Appellee's separate insurance obligations. The district court also correctly rejected Appellant's late-notice defense because Appellant has not shown the sort of extreme facts that would be necessary under English law to support recognition of that defense where, as here, timely notice is not a condition precedent to coverage. We therefore AFFIRM the district court's order granting summary judgment.

---

PETER R. CHAFFETZ (Andrew L. Poplinger, *on the brief*), Chaffetz Lindsey, LLP, New York, NY, *for Plaintiff-Appellee.*

SEAN THOMAS KEELY, Freeborn & Peters LLP, New York, NY, *for Defendant-Appellant* (Jill C. Anderson, Freeborn & Peters LLP, Chicago, IL, *on the brief*).

GERARD E. LYNCH, *Circuit Judge*:

This is a reinsurance dispute between Defendant-Appellant Equitas Insurance Limited ("Equitas") and Plaintiff-Appellee the Insurance Company of the State of Pennsylvania ("ICSOP"). In the late 1960s, ICSOP provided umbrella insurance to a predecessor of Dole Food Company for a policy period from October 1968 to October 1971 (the "ICSOP-Dole policy"). Equitas then reinsured part of ICSOP's exposure for the same three-year period.

2

Many years later, in 2009, homeowners in Carson, California, sued Dole for polluting their soil and groundwater. Dole and ICSOP settled those claims and allocated $20 million of the settlement liability to the ICSOP-Dole policy, even though the Carson plaintiffs' property damages and personal injuries continued to accrue after the ICSOP-Dole policy period had ended. In doing so, the settlement followed California law's approach to allocation, known as the "all sums rule," which treats any insurer whose policy was in effect during any portion of the time during which the continuing harm occurred as jointly and severally liable (up to applicable policy limits) for all property damages or personal injuries caused by a pollutant.

ICSOP thereafter sought reinsurance coverage from Equitas for its liability, only for Equitas to deny its claim on the basis that English law, which governs the reinsurance policy, would not have allocated ICSOP's liability on an all sums basis. Instead, Equitas asserted, English law would have prorated ICSOP's liability based on the number of years it provided coverage to Dole. Accordingly, Equitas contended that its reinsurance obligations were similarly limited. Equitas also defended its denial on the theory that ICSOP had deliberately delayed notice of claim, and thus forfeited any claim under the reinsurance policy.

ICSOP then brought this suit, claiming that Equitas was liable on the policy for the reinsured portion of ICSOP's settlement liability. Rejecting both of Equitas's arguments for denying coverage, the district court (Laura Taylor Swain, *C.J.*) granted summary judgment to ICSOP.

We agree with the district court. Although the question is not without doubt, we conclude that under the better reading of English law, Equitas's obligations under the reinsurance policy are co-extensive with ICSOP's obligations under the ICSOP-Dole policy. The question is not whether English law would have allocated ICSOP's liability on an all sums basis; English law does not govern ICSOP's liability. Instead, the question is whether, once ICSOP's liability was properly allocated, as Equitas concedes that it was, English law would then interpret the reinsurance policy as providing co-extensive coverage. Under English law, there is a strong presumption that facultative reinsurance policies provide back-to-back coverage, meaning that the liability of the insured is generally equivalent to the liability of the reinsured.

Searching for a way around that presumption, Equitas urges that the United Kingdom Supreme Court would never apply the back-to-back presumption where, as here, a foreign jurisdiction's law has the effect of

4

avoiding a reinsurance policy's coverage period. But the United Kingdom Supreme Court has never limited the presumption in that way, and it has in fact applied a version of the all sums rule in limited instances. Separately, English law has never recognized the defense of full repudiation based on late notice of claim where, as here, timely notice is not a condition precedent to coverage. While Equitas urges that English law would recognize such a defense on extreme facts, no such facts are present here.

We therefore **AFFIRM** the judgment of the district court.

## BACKGROUND

In the late 1960s, a subsidiary of Castle & Cooke Inc. purchased land in Carson, California, where Shell Oil Company had formerly operated an oil and petroleum containment facility. The Castle & Cooke subsidiary demolished the facility and developed a housing tract. Decades later, in 2008, the California Department of Toxic Substances Control tested a site adjacent to the housing tract and found hazardous levels of petroleum hydrocarbons, including benzene, a known carcinogen, in the soil and groundwater. Soon after that discovery, Carson homeowners sued Dole Food Company (with which Castle & Cooke had, by then, merged) and Shell in California state court. According to their

complaint, long-term benzene exposure can cause various latent diseases, such as anemia and leukemia, that can manifest many years after exposure. Thus, the homeowners sued for personal injuries and property damage related to the environmental contamination.

Shortly after suit was filed in October 2009, Dole notified its insurers. One insurer was ICSOP, a wholly-owned subsidiary of the American International Group, Inc. In 1968, ICSOP had issued umbrella insurance to Castle & Cooke (the "ICSOP-Dole policy"). The ICSOP-Dole policy covers up to $20 million for "all sums" for which Dole might be liable in damages "caused by or arising out of each occurrence happening during" a three-year policy period, from October 1, 1968, to October 1, 1971. J. App'x 754.

Dole and its insurers settled the homeowners' and other related lawsuits, assigning $20 million in liability to the ICSOP-Dole policy – even though that policy contained a three-year coverage period and even though the plaintiffs' losses accrued over four decades. The parties do not dispute either the fact or the extent of ICSOP's liability under the ICSOP-Dole policy. As for ICSOP's liability in general, the ICSOP-Dole policy sets "occurrence" as the relevant thing that must happen during the policy period, *id.*, and it defines occurrence to include

6

"an event or a continuous or repeated exposure to conditions which result in Personal Injury or Property Damage," *id.* at 755-56. As for the *extent* of ICSOP's liability, the settlement followed the "all sums" rule, a rule that is followed by the State of California, whose laws governed the settlement. *See Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 52 Cal. Rptr. 2d 690, 710-11 (Cal. Ct. App. 1996). While the ICSOP-Dole policy is governed by the laws of the State of Hawaii, neither party disputes that Hawaii, like California, follows that rule. *See Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd.*, 875 P.2d 894, 917 (Haw. 1994), *as amended* (June 24, 1994).

As discussed more fully below, the all sums rule applies in long-tail liability cases – cases that involve, for example, injuries that manifest many years after exposure to a pollutant – and holds insurers jointly and severally liable, up to applicable policy limits, for all property damages or personal injuries caused by the pollutant so long as some of the continuing harm occurred while each policy was in effect. *See Montrose Chem. Corp. of Cal. v. Superior Ct. of L.A. County*, 460 P.3d 1201, 1206-07 (Cal. 2020), *as modified* (May 27, 2020).

To cover part of its losses, ICSOP notified Equitas, its reinsurance carrier, of Dole's claim against the ICSOP-Dole policy. In 1969, ICSOP had obtained

7

facultative reinsurance[1] from underwriters at Lloyd's of London to hedge some of the risk stemming from the ICSOP-Dole policy; Equitas later inherited those reinsurance obligations from Lloyd's. The reinsurance policy spans the same three-year period as the ICSOP-Dole policy, and it covers up to $7,234,125 for each $20 million limit that ICSOP pays to Dole. It provides that reinsurance coverage is "[a]s [o]riginal," J. App'x 779, 796, and it contains a follow-the-settlements clause, which reads:

> Now We the Underwriters hereby agree to reinsure against loss to the extent and in the manner hereinafter provided.
>
> Being a Reinsurance of and warranted same gross rate, terms and conditions as and to follow the settlements of the Company . . . .

*Id.* at 777, 793.

Equitas has refused to cover any portion of ICSOP's part of the settlement and to pay ICSOP's claim.

---

[1] "In a facultative reinsurance transaction, the company purchasing reinsurance . . . 'cedes[]' all or a portion of the risk under a single insurance policy to the reinsurance provider," which in turn obtains a portion of the original premium. *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 88 (2d Cir. 2021). "In contrast to facultative reinsurance, 'treaty reinsurance' involves the transfer of a portion of the risk of numerous insurance policies issued to different policyholders covering an entire class of risk." *Id.* at 88 n.4.

In September 2017, ICSOP filed suit against Equitas for reinsurance coverage in the Southern District of New York. At the close of discovery, the parties cross-moved for summary judgment. Equitas principally argued that ICSOP is not entitled to indemnity under the reinsurance policy because, while it did not dispute ICSOP's liability *to Dole* under the all sums rule, Equitas's liability *to ICSOP* under the reinsurance policy is governed by English law, which does not follow that rule. Equitas also asserted a separate repudiation defense, contending that it may fully repudiate the reinsurance policy because ICSOP deliberately delayed notice of claim for about six years after becoming aware that a claim was likely, and misled Equitas into believing that ICSOP had no claim against the reinsurance policy.

For its part, although it agreed that English law governed the reinsurance policy, ICSOP argued that English law would interpret the reinsurance policy as "back-to-back" – that is, providing co-extensive coverage – with the ICSOP-Dole policy. ICSOP also argued that English law has never recognized a defense of full repudiation based on late notice of claim, and that in any event ICSOP's conduct did not reflect untimely notice or the extreme bad faith that, on one reading of English law, might permit such a defense.

9

The district court agreed with ICSOP, holding that the parties' obligations are co-extensive and rejecting Equitas's full repudiation defense. *See Ins. Co. of State of Pennsylvania v. Equitas Ins. Ltd.*, No. 17-6850, 2020 WL 4016815, at \*2-5 (S.D.N.Y. July 16, 2020). Consequently, it awarded ICSOP $7,234,125 in damages. *Id.* at \*6. Equitas appeals from that judgment.

## DISCUSSION

We review a grant of summary judgment de novo. *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). We first consider the scope-of-coverage issue – whether Equitas's obligations under the reinsurance policy are, as the district court held, co-extensive with ICSOP's obligations under the ICSOP-Dole policy. We then consider Equitas's repudiation defense. Because, as the parties agree, English law governs the reinsurance policy, our role is to predict how the United Kingdom Supreme Court would resolve those issues. *See Terra Firma Invs. (GP) 2 Ltd. v. Citigroup Inc.*, 716 F.3d 296, 299-300 (2d Cir. 2013) (predicting that "a rebuttable presumption of reliance" that attaches to some claims for "fraudulent misrepresentation" is "a burden-shifting device" under English law).[2]

---

[2] As a federal court sitting in alienage jurisdiction under 28 U.S.C. § 1332(a)(2), we apply the choice-of-law rules of the forum state – here, the State of New York.

10

## I.  Scope of Coverage

Under English law, a facultative reinsurance contract is "a separate contract" that "is not an insurance against liability." *Wasa Int'l Ins. Co. v. Lexington Ins. Co.* [2010] 1 AC 180 (HL) ¶ 32 (Lord Mance); *see also Delver v. Barnes* [1807] 127 Eng. Rep. 748 (CP) 749-50 (Mansfield, C.J.). Thus, "an insurer seeking indemnity under a reinsurance must, in the absence of special terms, establish *both* [1] its liability under the terms of the insurance *and* [2] its entitlement to indemnity under the terms of the reinsurance." *Wasa* [2010] 1 AC 180 (HL) ¶ 35 (Lord Mance) (emphasis added). To be entitled to indemnity, ICSOP therefore must show that its liability was properly allocated under the terms of the ICSOP-

---

*See Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) (applying the forum state's choice-of-law rules in dispute arising under § 1332(a)(2)); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding "that the prohibition declared in *Erie Railroad v. Tompkins*, 304 U.S. 64 [(1938)], against such independent determinations by the federal courts extends to the field of conflict of laws"). Because the parties agree that New York's choice-of-law rules compels the application of English law, we need not undertake a complicated choice-of-law analysis. "Under New York choice-of-law rules, 'where the parties agree that [a certain jurisdiction's] law controls, this is sufficient to establish choice of law.'" *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016), quoting *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (alterations added in *Alphonse Hotel*).

Dole policy and that it is entitled to indemnity for that liability under the reinsurance policy.

### A. Liability under the ICSOP-Dole Policy

Equitas does not dispute ICSOP's liability to Dole under the ICSOP-Dole policy or the settlement's apportionment of damages. Nonetheless, because some of Equitas's arguments against indemnity under the reinsurance policy concern whether English law is receptive to the all sums rule, it is helpful to outline some general principles of American and English law that inform those arguments. Those principles aid our prediction of how the United Kingdom Supreme Court would decide the contested question of indemnity in the reinsurance context.

### i. American Tort and Insurance Law

As one commentator has put it, "[v]ery few developments have ever transformed either tort or insurance law, . . . and only one[] [development] has transformed both . . . ." Kenneth S. Abraham, *The Long-Tail Liability Revolution: Creating the New World of Tort and Insurance Law*, 6 U. Pa. J.L. & Pub. Aff. 347, 349 (2021) (emphasis omitted). That development is the rise in tort and insurance litigation concerning "long-tail harms," a term that "describes a series of indivisible harms, whether bodily injury or property damage, that are

attributable to continuous or repeated exposure to the same or similar substances or conditions that take place over multiple years or that have a long latency period." Restatement of the Law of Liability Insurance § 33 cmt. *f* (Am. L. Inst. 2019) (identifying "asbestos-related bodily injuries and environmental property damage" as two "paradigmatic examples").

In tort law, long-tail harms present "quintessentially difficult causation questions, largely because of the length of time between the defendant's allegedly tortious conduct and the manifestation of injury, disease, or damage that may have been caused by that conduct." Abraham, *supra*, at 357-58. Those quandaries inspired judicial innovations regarding but-for causation. In the seminal case on market-share liability, for example, the Supreme Court of California addressed claims brought by the daughters of mothers who had ingested diethylstilbestrol ("DES") during their pregnancies, which led to latent injuries manifesting in their daughters many years later. *See Sindell v. Abbott Lab'ys*, 607 P.2d 924, 925-26 (Cal. 1980). Ordinarily, the doctrine of but-for causation would have required the plaintiff-daughters to prove which of many manufacturers had produced the DES that their mothers had ingested. *See id.* at 927-28. But the Supreme Court of California relieved them of that near-

13

impossible burden, holding that "[e]ach defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused plaintiff's injuries." *Id*. at 937.

Similarly, when it comes to asbestos-related injuries, it is nearly impossible to prove with "absolute certainty which particular exposure to asbestos dust resulted in injury to" a particular plaintiff, especially for an employee who was exposed to several different sources of asbestos from several different employers. *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973). In responding to that issue, courts developed more plaintiff-friendly causation rules. In *Borel*, for example, the Fifth Circuit (applying Texas law) held that it was enough for a victim of mesothelioma and asbestosis to show that he was tortiously "*exposed* to the [asbestos-contaminated] products of all the defendants on many occasions." *Id.* (emphasis added). Mere tortious exposure was sufficient, the court held, because "[i]t was . . . established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury." *Id.* Similarly, in *Rutherford v. Owens-Illinois, Inc.*, the Supreme Court of California held that "plaintiffs may prove causation in

14

asbestos-related cancer cases by demonstrating that the plaintiff's *exposure* to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing . . . to the *risk* of developing asbestos-related cancer. 941 P.2d 1203, 1219 (Cal. 1997), *as modified* (Oct. 22, 1997) (first emphasis added; footnote omitted). Under that approach, a plaintiff need not "demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that actually produced the malignant growth." *Id.* (emphasis omitted).

Those judicial innovations and others like them expanded the universe of liable defendants, and thus spawned ever more difficult questions concerning how to allocate that liability. Those questions still remain. There appears to be no majority American rule, for instance, governing how to allocate liability when multiple defendants are liable for an indivisible injury – like mesothelioma or other cancers or property damage – flowing from environmental contamination; some jurisdictions appear to employ hybrid approaches to apportioning liability. *See* Restatement (Third) of Torts: Apportionment Liab. § 17 cmt. *a* (Am. L. Inst. 2000) (collecting various approaches). On the one hand, eight years after *Sindell*, the Supreme Court of California rejected the imposition of joint-and-several liability in the context of market-share liability, confining liability instead to the

15

defendants' respective share of the market. *See Brown v. Superior Court (Abbott Lab'ys)*, 751 P.2d 470, 485-87 (Cal. 1988). On the other, the *Borel* court (again applying Texas law) imposed joint-and-several liability. 493 F.2d at 1095-96.

Related developments occurred in the world of insurance law as claims for long-tail harms made their way through the courts. With rising long-tail tort liability and a competitive American insurance market in the 1960s, comprehensive general liability insurance shifted from covering tort liability caused by an "accident," which arguably covered only abrupt events that resulted in immediate harm, to covering tort liability caused by an "occurrence." Abraham, *supra*, at 369-71.[3] That change was "a recognition that the policy was to cover liability for harm caused by pollution and other similar, slowly-occurring processes." *Id.* at 371.

---

[3] Ironically, that shift appears to have been led by Lloyd's seeking to tap into the American insurance market. Abraham, *supra*, at 370-71. Lloyd's faced a "financial disaster," however, when "the long-tail chickens" came "home to roost." *Id.* at 371. To stave off financial ruin, it "established and funded" Equitas "to be the repository of its syndicates' liability under CGL policies issued prior to 1992." *Id.* at 402. Thus, Equitas hatched from a problem its predecessor helped sire, the same problem ICSOP confronted with Dole, that ultimately led to ICSOP's claim against Equitas.

The ICSOP-Dole policy descends from that lineage. Executed in the late 1960s, it covers Dole for "all sums" that Dole "shall be obligated to pay by reason of liability imposed upon [Dole] by law," and for "all damages, direct or consequential, . . . on account of personal injuries . . . and property damage, caused by or arising out of each *occurrence* happening *during* the policy period." J. App'x 754 (emphases added). Notably, the ICSOP-Dole policy defines "occurrence" broadly to include "an event or a continuous or repeated *exposure* to conditions which result in Personal Injury or Property Damage." *Id.* at 755-56 (emphasis added).

That language appears to codify the so-called "continuous injury" trigger in insurance law. Whether insurance coverage is "triggered" refers to the question of "what events, from the point of exposure to the point of manifestation, trigger coverage." *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1042 (D.C. Cir. 1981). In answering that question, courts within the United States have developed several approaches: (1) the manifestation theory, where coverage is triggered when an injury manifests, even if the injury occurred many years earlier; (2) the injury-in-fact theory, where coverage is triggered when an injury actually occurs, even if the injury might manifest many years later; (3) the

17

exposure theory, where coverage is triggered when the injured person or property is exposed to the risk that later manifests into harm; and (4) the continuous injury trigger, where coverage is triggered throughout the progression of a disease or property damage, from initial exposure to the risk all the way to manifestation of harm. Restatement of the Law of Liability Insurance § 33 cmt. *f*; *see also Sentinel Ins. Co.*, 875 P.2d at 914-15.[4] There is no consensus rule. Importantly for our purposes, California and Hawaii have adopted the continuous injury trigger when interpreting occurrence-based policies like the ICSOP-Dole policy. *See Montrose Chem. Corp. of Cal.*, 460 P.3d at 1206-07; *Sentinel Ins. Co.*, 875 P.2d at 917 (Hawaii law; adopting an "injury-in-fact" theory in general, but adopting the continuous injury theory where the "injury-in-fact occurs continuously over a period covered by different insurers or policies, and

---

[4] Some courts apply different theories that, depending on the circumstances, result in "little ultimate difference" between types of triggers. *See* Restatement of the Law of Liability Insurance § 33 cmt. *f*. For example, in jurisdictions that follow the injury-in-fact theory, "when the available scientific evidence is not able to determine the precise amount of harm attributable to a particular year or to particular years, most courts have concluded either that the continuous-trigger rule applies or, applying the injury-in-fact trigger, that the bodily injury or property damage actually takes place continuously from the moment of first exposure to asbestos or environmental contaminants." *Id.*

actual apportionment of the injury is difficult or impossible to determine").

Hence, there is no dispute that ICSOP was liable to Dole.

The *extent* of ICSOP's liability to Dole presents a different, though also undisputed, question. The continuous injury trigger implicates distinct allocation issues because that trigger presents circumstances where multiple insurers, like multiple defendants in a tort action, might be liable. It also presents circumstances where, as here, a single insurer is liable even though that insurer provided coverage during only a short part of the period of exposure to the risk that later evolved into harm.[5]

---

[5] Recall that ICSOP insured Dole only for a three-year policy period but was deemed liable for damage that continued to accrue for decades after the policy period had ended. As far as the record discloses, Dole obtained other insurance during that time, but apparently many (or all) of its policies for later periods contained pollution *exclusions*, while the ICSOP-Dole policy did not. Pollution exclusions were not an uncommon response in occurrence-based policies issued following legal developments beginning in the 1960s. *See* Abraham, *supra*, at 372-73 (explaining that insurers "got cold feet" and began to include "'qualified' pollution exclusion[s]" in the 1970s). We cannot independently verify the extent to which Dole had other insurance coverage against which ICSOP could assert a contribution claim. But that does not matter for our purposes because whether or not other insurance coverage was available to Dole, the all sums rule deems ICSOP jointly and severally liable, up to the ICSOP-Dole policy limit, for Dole's settlement liability. *See Montrose Chem. Corp. of Cal.*, 460 P.3d at 1207.

In those circumstances, some jurisdictions, like California and Hawaii, follow the all sums rule. That rule resolves the allocation issue in favor of the insured by holding the insurer jointly and severally liable for "all sums for property damage attributable to the polluted site, up to their policy limits, if applicable, as long as some of the continuous property damage occurred while each policy was on the loss." *Montrose Chem. Corp. of Cal.*, 460 P.3d at 1207 (internal quotation marks, citation, and brackets omitted); *see also Sentinel Ins. Co.*, 875 P.2d at 915 (similar under Hawaii law). That rule reflects the understanding that an insurer's duty to the insured is an issue distinct from apportionment and allocation between multiple insurers. *See Armstrong World Indus., Inc.*, 52 Cal. Rptr. 2d at 710-11, 742. In other words, once an insurer is on the hook for "all sums," the dispute between the insured and insurer ends, and a contribution dispute between co-insurers begins. In light of that understanding, a policyholder may obtain full recovery from one insurer even if it was insured by several successive insurers or uninsured for part of when the damages accrued. *Id.*

Courts have applied the all sums rule where language in the policy required the insurer to pay "all sums" for which the insured becomes liable on

account of an event during the policy period. *California v. Cont'l Ins. Co.*, 281 P.3d 1000, 1007-08 (Cal. 2012), *as modified* (Sept. 19, 2012); *see also Keene Corp.*, 667 F.2d at 1047-50. The ICSOP-Dole policy contains that language. *See* J. App'x 754. Thus, Equitas does not dispute the extent of ICSOP's liability to Dole under California law.

An alternative approach is to prorate responsibility "by year among triggered policy years." Abraham, *supra*, at 380. For example, "[i]f a $200 million liability triggered twenty policy years, then each policy year would be potentially responsible for its pro-rata share of $10 million." *Id.*

"There is some disagreement over the precise number of jurisdictions that have adopted each position" – the all sums rule or the *pro rata* approach – "in part because of variation in policy language and in part because of differing possible interpretations of the holdings in some cases." Restatement of the Law of Liability Insurance § 41 cmt. *c*. What seems to be clear, however, is that "a significant number of courts" have adopted the all sums rule, "a clear majority" have adopted the *pro rata* approach, and "many courts have not yet taken a position." *Id.*; *see also Rossello v. Zurich Am. Ins. Co.*, 226 A.3d 444, 451 nn.12-13 (Md. 2020) (collecting some of the divide).

21

Whether to relax causation in tort, set a default rule that more expansively triggers insurance coverage, or allocate liability on a *pro rata* or all sums basis, are quintessentially public policy questions. As a federal court sitting in alienage jurisdiction, it is not our role to answer those questions. Instead, our role is to determine how English law would resolve those issues in the context of *reinsurance*. How English law has approached those issues in the context of tort liability and *insurance* is therefore helpful to understanding the parties' arguments.

*ii.     English Tort and Insurance Law*

As with American law, we begin our discussion of English law with torts. In *Fairchild v. Glenhaven Funeral Services Ltd.*, the House of Lords heard an appeal involving three claimants whose long-term and substantial exposure to asbestos caused them to develop mesothelioma. [2003] 1 AC 32 (HL) ¶¶ 3-5 (Lord Bingham). The Lords considered whether there were "special circumstances," in light of the medical uncertainty concerning how asbestos exposure causes mesothelioma, that would justify deviating from the ordinary rule of but-for causation. *Id.* ¶ 9; *see also id.* ¶¶ 41, 43 (Lord Nicholls); *id.* ¶¶ 56, 63 (Lord Hoffmann). Citing California's approach, the Lords in *Fairchild* agreed to deviate

22

from the traditional rule, holding that an employer is liable if the employer

"wrongful[ly] expose[d] . . . its employee to asbestos dust" and that exposure

was not "insignificant" but rather materially increased the risk that the employee

would contract disease. *Id.* ¶ 42 (Lord Nicholls); *see also id.* ¶¶ 31, 34 (Lord

Bingham); *id.* ¶¶ 47, 63, 73 (Lord Hoffmann); *id.* ¶¶ 105, 107-09 (Lord Hutton); *id.*

¶¶ 161, 168 (Lord Rodger).[6]

After *Fairchild*, the House of Lords faced the allocation issue in *Barker v.*

*Corus UK Ltd.* [2006] 2 AC 572 (HL). Ordinarily, under English law, if two

tortfeasors are the proximate cause of an indivisible injury, like mesothelioma,

both tortfeasors are jointly and severally liable. *See id.* ¶ 28 (Lord Hoffmann).

Applying that apportionment rule, liability under *Fairchild* would seem to result

in joint-and-several liability, because a necessary condition for *Fairchild* liability is

that the claimant suffer an indivisible injury. *Id.* ¶ 61 (Lord Scott). But that would

be incongruent with the basis of *Fairchild* liability, which is the creation of a

---

[6] *Barker v. Corus UK Ltd.* [2006] 2 AC 572 (HL) ¶ 1 (Lord Hoffmann) (explaining that *Fairchild* held "that a worker who had contracted mesothelioma after being wrongfully exposed to significant quantities of asbestos dust at different times by more than one employer or occupier of premises could sue any of them, notwithstanding that he could not prove which exposure had caused the disease").

material increase in risk, even if the defendant did not factually cause the injury. *Id.* ¶ 53 (Lord Scott); *see also id.* ¶ 126 (Baroness Hale) ("For the first time in our legal history, persons are made liable for damage even though they may not have caused it at all . . . ."). Thus, in *Barker*, the House of Lords rejected a rule that apportioned tort liability on a joint-and-several basis between multiple employers who exposed their employee to asbestos and were thereby liable under the *Fairchild* rule. *Id.* ¶ 48 (Lord Hoffmann); *id.* ¶ 62 (Lord Scott); *id.* ¶¶ 109-10 (Lord Walker); *Id.* ¶ 127 (Baroness Hale). The House of Lords instead allocated liability on a *pro rata* basis. *Id.*

In response, however, Parliament passed the Compensation Act 2006 c. 29 § 3, effectively reversing that aspect of *Barker*. *See Durham v. BAI (Run off) Ltd.* [2012] UKSC 14 ¶ 78 ("*Trigger*") (Lord Clarke) ("Th[e] [allocation] decision [in *Barker*] was reversed by the Compensation Act 2006, so that such employers are jointly and severally liable for the whole of the consequences."). The Compensation Act 2006 holds "that when a victim contracts mesothelioma each person who has, in breach of duty, been responsible for exposing the victim to a significant quantity of asbestos dust and thus creating a 'material increase in risk' of the victim contracting the disease will be held to be jointly and severally liable

24

in respect of the disease." *Id.* ¶ 5 (Lord Mance).

English insurance law followed that development. In *Trigger*, the United Kingdom Supreme Court held that insurers who cover employers who are liable under the Compensation Act 2006 are likewise liable for such claims against the employers. *Id.* ¶¶ 49-50, 71-74. Lord Mance explained that "[w]here two contracts are linked" – as in the reinsurance context – "the law will try to read them consistently with each other." *Id.* ¶ 69. Thus, "[t]he intention under the present insurances must be taken to have been that they would respond to whatever liability the insured employers might be held to incur within the scope of the risks insured and within the period in respect of which they were insured." *Id.*

Then in *Zurich Insurance PLC UK Branch v. International Energy Group Ltd.*, the United Kingdom Supreme Court extended *Trigger*, holding that insurers are jointly and severally liable on an all sums basis for their insured's liability when that insured is jointly and severally liable pursuant to the Compensation Act. [2015] UKSC 33 ¶¶ 45-51, 54, 94-97 (Lord Mance). In so holding, the Court explained that "facultative liability insurance" – again, like facultative reinsurance – "normally responds to whatever may prove to be the liability incurred by the insured." *Id.* ¶ 45. Thus, "[o]nce one accepts that causation

25

equates with exposure, in tort and tort liability insurance law," as was held in *Fairchild* and *Trigger*, "there is no going back on this conclusion simply because there was exposure by the insured of the victim both within and outside the relevant insurance period." *Id.* ¶ 46. That is so despite, as a dissenting Lord pointed out, "the fundamental importance under English law of the temporal scope of a time policy," *id.* ¶ 153 (Lord Sumption), quoting *Wasa* [2010] 1 AC 180 (HL) ¶ 15 (Lord Brown). Just as the California Court of Appeal recognized in *Armstrong World Industries*, 52 Cal. Rptr. 2d at 710-11, the United Kingdom Supreme Court recognized that the "primary question" concerns the duty that the insurer owes to the insured – in *Zurich*, to cover the insured's liabilities flowing from exposure to asbestos – not the relative position "between two insurers." *Zurich* [2015] UKSC 33 ¶ 48 (Lord Mance). Viewed that way, "there is . . . nothing illogical about a conclusion that each of successive insurers is potentially liable in full, with rights of contribution inter se." *Id.*

But the Compensation Act is limited to the particular situation of asbestos-related mesothelioma. Where that Act does not apply, as is the case here, neither does *Zurich*'s adoption of joint-and-several liability. *See id.* ¶¶ 8-9, 35; *cf. Wasa* [2010] 1 AC 180 (HL). That is because policy periods are accorded fundamental

importance under English law. *See Municipal Mutual Ins. Ltd. v. Sea Ins. Co. Ltd.* [1998] Lloyd's Rep. (Civ) 421, 436 (Hobhouse, L.J.) ("When the relevant cover is placed on a time basis, the stated period of time is fundamental and must be given effect to.").

B.     *Indemnity under the Reinsurance Policy*

As we have already noted, both parties agree that the reinsurance policy is governed by English law. And because the Compensation Act does not apply here, English law would not have allocated ICSOP's liability under the underlying ICSOP-Dole policy on an all sums basis. But that fact does not resolve the question whether the United Kingdom Supreme Court would construe the *reinsurance* policy as entitling ICSOP to indemnity for its properly allocated liability.

Under English law, the terms of a reinsurance policy must be interpreted in light of its "commercial purpose" and circumstances. GRAYDON S. STARING & HON. DEAN HANSELL, LAW OF REINSURANCE § 13:1 (Mar. 2022 update), quoting *Reardon Smith Line Ltd. v. Hansen-Tangen* [1976] 2 Lloyd's Rep. 621 (HL) 624-25 (Lord Wilberforce); *see also Charrington & Co. v. Wooder* [1914] AC 71 (HL) 82 (Lord Dunedin). In the context of facultative reinsurance, the original insurer

27

reinsures part of its risk by paying the reinsurer "a proportional share of the premium." *Wasa* [2010] 1 AC 180 (HL) ¶ 55 (Lord Collins). "[T]he obvious commercial intention" of that arrangement is "for the reinsurer to accept that part of the risk." *Id.* ¶ 60. "Consequently, the *starting point* is that normally reinsurance of that kind is *back-to-back* with the insurance, and that the reinsurer and the original insurer enter into a bargain that if the insurer is liable under the insurance contract, the reinsurer will be liable to pay the proportion which it has agreed to reinsure." *Id.* ¶ 55 (emphases added).

English law therefore recognizes a "strong" – though not conclusive – presumption that "liability under a proportional facultative reinsurance is co-extensive with the insurance." *Id.* ¶ 116. Thus, it will "almost invariably be the case" that losses falling within the original insurance policy will also fall within the reinsurance, "even if the losses are payable under a foreign law . . . which takes a view different from English law" on liability. *Id.* That "obvious" outcome "is simply commercial common sense." *Id.* ¶ 60. While a facultative reinsurance contract can deviate from that presumption, "[s]uch a contract would . . . be wholly exceptional" and constitute "a departure from the normal understanding

of the back-to-back nature of reinsurance." *Id.* ¶ 62 (internal quotation marks and citation omitted).

A seminal English case applying that presumption is *Forsikringsaktieselskapet Vesta v. Butcher* [1989] 1 AC 852 (HL) ("*Vesta*"). There, an insurance policy covered a fish farm and contained a warranty requiring the farm to keep a 24-hour watch; the reinsurance policy in question, which covered that original insurance policy, contained the same warranty. *Id.* at 890-91 (Lord Templeman). The owner of the fish farm failed to keep the watch as required, and the farm was destroyed. *Id.* What destroyed the farm, however, was not failure to keep a watch, but rather a storm. *Id.* Under Norwegian law, which governed the original insurance policy, the breach of warranty was no defense to liability because the owner's failure to keep a watch was not what destroyed the fish farm. *Id*. at 891. Had the original policy been governed by English law – which governed the reinsurance policy – that same non-causative breach *would* have entitled the original insurer to refuse payment. *Id*. However, the House of Lords held that absent some "express declaration to the contrary in the reinsurance policy, a warranty must produce the same effect in each policy." *Id.* at 892. It reasoned that the parties, who had access to a "Norwegian legal

29

dictionary" when they agreed upon the original contracts, must have intended the clause to have the same meaning in both the insurance and the reinsurance – that is, the meaning given by Norwegian law – and thus provide back-to-back coverage. *Id.* at 911 (Lord Lowry).

Equitas argues that *Vesta* and, more broadly, the back-to-back presumption do not apply here. It insists that *Wasa*, a case with similar facts to this one, limits the back-to-back presumption. In *Wasa*, an insurance company, Lexington, issued a $20 million insurance policy to Aluminum Co. of America ("Alcoa"), which Lexington then reinsured in the London market with two English reinsurers. [2010] 1 AC 180 (HL) ¶¶ 18-21 (Lord Mance). Neither contract specified a governing law, although the insurance included a "service of suit clause" that required Lexington to "submit to the jurisdiction of any court of competent jurisdiction within the United States." *Id.* ¶ 19 (internal quotation marks omitted). Both contracts covered a three-year period, but the Washington Supreme Court held that Pennsylvania law, which followed the all sums rule, applied to a group of consolidated claims and that the underlying Alcoa policy could therefore cover environmental damages spanning 44 years. *Id.* ¶¶ 12-13 (Lord Brown); *id.* ¶¶ 19-20, 25-26 (Lord Mance). Lexington sued its English

reinsurers to cover their share of the risk. But this time, unlike in *Vesta*, the House of Lords held that the back-to-back presumption did not apply, and it instead strictly construed the reinsurance contract's three-year temporal provision. *Id.* ¶ 54 (Lord Mance); *id.* ¶ 116 (Lord Collins).

But *Wasa* differs from this case in one important aspect. There, the underlying Alcoa policy did not contain a choice-of-law clause, and it was unpredictable at the time of contracting that Pennsylvania law would govern the Alcoa policy. Here, by contrast, the underlying ICSOP-Dole policy contains an express choice-of-law clause directing the application of Hawaii law, which, Equitas concedes, like California law, follows the all sums rule in environmental suits involving continuous and indivisible injuries.

In *Wasa*, the absence of a choice-of-law clause was significant to Lords Collins and Mance, whose speeches garnered support from a majority of the Lords. Lord Mance explained that the Washington Supreme Court found that Pennsylvania law governed the Alcoa policy by "taking into account matters and events extraneous to th[at] policy." *Id.* ¶ 49. The choice of Pennsylvania law could not, therefore, "be regarded as in any sense predictable at the time when the reinsurance was placed." *Id.* It was for that reason that *Wasa* presented

"materially different" circumstances from those presented in *Vesta*. *Id.* While in *Vesta* it was possible "to identify the foreign law which would govern the insurance" when the contract was formed, *id.* ¶ 44, in *Wasa* "[t]here was . . . no identifiable legal dictionary (formal or informal), still less a Pennsylvanian legal dictionary," at the time of contracting that "could lead to any different interpretation of the reinsurance wording," *id.* ¶ 49. Lord Collins distinguished *Vesta* on the same basis. "[I]n complete contrast to the *Vesta* case," Lord Collins explained, "there was in 1977, when the [*Wasa*] insurance contract and the reinsurance contract were concluded, no identifiable system of law applicable to the insurance contract which could have provided a basis for construing the contract of reinsurance in a manner different from its ordinary meaning in the London insurance market." *Id.* ¶ 108. Meanwhile, in *Vesta*, "the substance of the foreign law as to the consequences of a non-causative breach of warranty could be ascertained at the outset, if necessary by recourse to a relevant Norwegian . . . legal source." *Id.*

Here, as in *Wasa*, the ability or inability to predict the law governing the original insurance when the parties execute reinsurance is no small factor. Under English law, "a contract has a meaning which is to be ascertained . . . when it is

32

concluded." *Id*. ¶ 45 (Lord Mance). Thus, absent an ability to predict the governing legal regime at the outset, an unspecified foreign law cannot dictate the meaning of a reinsurance contract. The presence of a choice-of-law clause in the ICSOP-Dole policy therefore distinguishes this case from *Wasa*.

To be sure, *Wasa* left open whether the presence of a choice-of-law clause would have revived the back-to-back presumption. In the course of arguing *Wasa*, counsel for Lexington asked the House of Lords, "what more could Lexington have done to reinsure themselves on a fully back to back basis?" *Id.* ¶ 51. Tellingly, among other responses, Lord Mance replied that "steps could . . . be taken to make the insurance subject to an identifiable governing law, *though this would not necessarily foreclose all argument*." *Id.* (emphasis added).

But, even as *Wasa* does not altogether foreclose Equitas's arguments, we do not believe that the United Kingdom Supreme Court would be persuaded by them.

### i.    *The Fundamental Importance of a Policy Period*

Equitas argues that *Wasa* hinged not just on the lack of a choice-of-law clause, but also on the fundamental importance of a policy period to English insurance law. That argument is not without force. As Equitas argues, a policy

33

period is indeed accorded "fundamental importance" under English law. *Id.* ¶ 15 (Lord Brown). As Lord Brown pointed out in *Wasa*, if the policies were back-to-back, then Lexington, the insurer in that case, could have recovered the full loss no matter how short the period of cover, whether it was three years or "only three months." *Id.* Disregarding a policy period would, Lord Collins wrote in *Wasa*, lead to some "very uncommercial consequences." *Id.* ¶ 111. Similarly, Lord Mance explained that the "all sums" doctrine was a "fundamental and surprising change[] in the ordinary understanding . . . of a reinsurance period." *Id.* ¶ 40. *Vesta* did not involve a policy period. Instead, it involved "uncommercial and technical points" of English law: the ability of an insurer to deny coverage based on a breach of a warranty that had no causal relationship to the insured's losses. *Id.* ¶ 56 (Lord Collins). In that area, Lord Mance explained in *Wasa*, "English law has long been recognised as unduly stringent and in need of review." *Id.* ¶ 50.

Even so, Equitas's theory falls short for several reasons. To start, the opinion of Lord Brown, who relied most heavily on the fundamental nature of the policy period, did not gain majority support. Lords Mance and Collins, who were joined by a majority, put decisive weight on the inability to predict the governing legal regime at the time the contract was executed. *See id.* ¶ 49 (Lord

Mance) (distinguishing *Vesta* on the basis that there was an "identifiable legal dictionary" to interpret the contracts in that case); *id*. ¶ 108 (Lord Collins) (describing the lack of an "identifiable system of law" as in "complete contrast" to *Vesta*).[7] Moreover, as even Equitas's English law expert acknowledges, the back-to-back presumption is not "confined to such unattractive types of case[s]" like *Vesta*. J. App'x 1178, ¶ 41. Rather, Lord Collins in *Wasa* explained that modern English law would likely apply the presumption even in a case involving a dispute about the definition of the very risk that the parties bargained to insure. [2010] 1 AC 180 (HL) ¶¶ 64-65, citing *St. Paul Fire & Marine Ins. Co. v. Morice* [1906] 11 Com. Cas. 153, a case that involved the meaning of "all risks of mortality" in an insurance dispute about coverage of a bull who was slaughtered on board a ship after contracting foot and mouth disease.

More significantly, Equitas's "fundamental importance" argument relies on its view that the all sums rule is "anathema" to English insurance law.

---

[7] While on the Supreme Court of the United Kingdom, Lord Mance gave a speech to an association of insurers, during which he repeated that *Wasa* was based on the absence of a "special dictionary meaning" of the terms of the original insurance that "could [have] be[en] carried through into the reinsurance." Lord Mance, Supreme Court of the United Kingdom, Keynote Address to Association internationale de Droit des Assurances, Copenhagen ¶ 10 (June 12, 2015), https://www.supremecourt.uk/docs/speech-150612.pdf.

Appellant's Br. 21-22, 32. That view, however, rests on a misreading of *Municipal Mutual* [1998] Lloyd's Rep. (Civ) 421, as well as an incomplete account of English law. In *Municipal Mutual*, England's Court of Appeal declined to apply the back-to-back presumption to hold that the coverage period of an insurance policy was co-extensive with the coverage periods of several successive reinsurance policies. *Id.* at 435-36 (Hobhouse, L.J.). All policies, however, were given an English law construction, and the reinsurances' coverage periods were textually narrower than the original insurance's coverage period. *Id.* Additionally, the Court of Appeal rejected an all sums allocation of liability in part because the case did not involve "the special problems of liability for asbestosis claims arising from long periods of potential exposure." *Id.* at 436. Instead, the facts of *Municipal Mutual* presented "much simpler questions." *Id.*

And as outlined above, while English law does not generally follow the all sums rule, in more complex cases involving asbestos liability, English law *has* followed a version of the all sums rule, albeit in circumstances that are not present here. After the House of Lords initially eschewed apportioning tort liability jointly and severally between multiple employers who exposed their employees to asbestos, *see Barker* [2006] 2 AC 572 (HL) ¶ 49 (Lord Hoffmann),

36

Parliament passed the Compensation Act 2006 c. 29 § 3, making "each" employer who materially increases the risk that its employee would develop mesothelioma jointly and severally liable "in respect of the whole of the damage caused by the mesothelioma." *Trigger* [2012] UKSC 14 ¶ 57 (Lord Mance). True, the text of the Act applies to employer tort liability, not insurance liability. But that did not stop the United Kingdom Supreme Court from holding that where the Act holds an employer jointly and severally liable, its insurers are likewise jointly and severally liable, on an all sums basis, with various rights to contribution, even if the employer has multiple successive insurers or was uninsured for part of the employee's exposure. *Zurich* [2015] UKSC 33 ¶¶ 45-51, 54, 94-97 (Lord Mance); *see also Trigger* [2012] UKSC 14 ¶¶ 49-50, 71-74 (Lord Mance). In so holding, the Court analogized "facultative liability insurance" to facultative reinsurance, in that both "normally respond[] to whatever may prove to be the liability incurred by the insured." *Zurich* [2015] UKSC 33 ¶ 45 (Lord Mance); *see also Trigger* [2012] UKSC 14 ¶ 69 (Lord Mance). Notably, one dissenting Lord invoked *Municipal Mutual* and *Wasa* – as Equitas does here – to emphasize the fundamental importance of a policy period under English insurance law. *Zurich* [2015] UKSC 33 ¶¶ 153-55 (Lord Sumption). But, again, that did not stop the majority, which

37

acknowledged that principle, from imposing joint-and-several liability upon insurers nonetheless. *Id.* ¶¶ 40, 46 (Lord Mance). There is no reason to think it would stop that majority from imposing joint-and-several liability on a *reinsurer* in the present circumstances either.

To be clear, we do not know whether *Zurich*, if applied here, would lead to the same outcome concerning ICSOP's liability to Dole or Equitas's liability to ICSOP. *Zurich* recognizes various rights of contribution, including under principles of self-insurance, *see* [2015] UKSC 33 ¶¶ 65-82, which may or may not differ from California's and Hawaii's approaches to contribution. The point of our reliance on *Zurich* is that the case recognizes a circumstance where an insurer can be jointly and severally liable for the whole of the insured's tort liability even though that liability might have accrued after the policy period's expiration. That recognition defeats Equitas's argument that the all sums rule is anathema to English law. Accordingly, *Zurich* reinforces the conclusion that English law would construe the reinsurance policy in this case as co-extensive with the ICSOP-Dole policy.

### ii.     *Change in Law*

Equitas next underscores that even if the presence of a choice-of-law clause distinguishes this case from *Wasa*, the all sums rule first came into existence long after the parties executed the ICSOP-Dole policy and the reinsurance policy (and, for that matter, long after the policy periods ended). For that reason, Equitas insists, the parties here could not have predicted an all sums approach to allocating liability, and an English court would therefore not impose that approach.

Again, that argument has some merit. The Lords in *Wasa* were troubled not only by the inability to predict the governing legal regime but also by the resulting inability to predict the substantive rules of that regime. For example, Lord Phillips suggested that it was "unlikely" that the parties could have anticipated that the same words in the original insurance and the reinsurance would mean "radically" different things under different legal systems. *Wasa* [2010] 1 AC 180 (HL) ¶¶ 4-5. Lord Collins explained that in *Vesta* the "substance of the foreign law as to the consequences" of the 24-hour watch clause "could be ascertained at the outset," whereas, in *Wasa*, it was impossible to predict that a

39

U.S. court would apply the all sums rule because U.S. courts had not yet developed that rule when the parties executed their agreements. *Id*. ¶¶ 108-09.

That point cannot be decisive, however. The reinsurers in *Wasa* made the exact same argument. Assuming that the reinsurers were correct that Pennsylvania law had only later adopted the all sums rule, Lord Mance asked, "would that matter?" *Id.* ¶ 53. Noting an observation of Lord Justice Longmore, who sat on the appellate court from which the reinsurers had appealed, Lord Mance explained the Court of Appeal's view that "[i]t would have been 'nothing to the point'" if in *Vesta*, for example, "'the relevant Norwegian statute had been enacted after the inception of the policy.'" *Id*. (citation omitted). "[R]einsurers must," Lord Justice Longmore had explained, "take the risk of any change in the law." *Id.* And there, as here, "one is only talking at most about a change in the construction put at common law on a particular contract wording." *Id.* Likewise, Lord Collins explained that "[i]t is elementary" that insurers and reinsurers "take[] the risk of changes in the law" and cannot "be heard to say that [they] rated the risk by reference to the then current scope of the original insured's duty . . . provided that the risk is within the reinsurance." *Id.* ¶ 110.

Thus, when parties fail to define in their insurance agreements a term such as "all sums" – the term that invokes the all sums rule – they adopt the meaning a common law court will ascribe to it, and thereby bear the rewards and risks of the common law's dynamic nature. *See Trigger* [2012] UKSC 14 ¶ 70 (Lord Mance), citing *Kleinwort Benson Ltd v. Lincoln City Council* [1999] 2 AC 349 (HL) 378-79 (Lord Goff) (explaining that "when . . . judges state what the law is, their decisions . . . have a retrospective effect" not only "in relation to the particular case" but "also inevitabl[y] in relation to other cases in which the law as so stated will in future fall to be applied" because no "common law system . . . can operate otherwise if the law is [to] be applied equally to all and yet be capable of organic change"); *Woodland v. Essex County Council* [2013] UKSC 66 ¶ 28 (Lady Hale) ("The common law is a dynamic instrument. It develops and adapts to meet new situations as they arise. Therein lies its strength. But therein also lies a danger, the danger of unbridled and unprincipled growth to match what the court perceives to be the merits of the particular case.").

To that end, turning back to *Zurich* and *Trigger*, the United Kingdom Supreme Court acknowledged in those decisions that the relevant policies were executed before the various legal developments leading to those decisions had

41

occurred. *See Zurich* [2015] UKSC 33 ¶ 149 (Lord Sumption); *Trigger* [2012] UKSC 14 ¶ 70 (Lord Mance). But that did not stop the Lords from imposing liability upon insurance carriers in *Trigger* and joint-and-several liability upon insurance carriers in *Zurich*. It would be incongruent to make the change-of-law point decisive here where it was not in those cases, and unfaithful to our mandate to predict how the United Kingdom Supreme Court would decide an issue to do something directly contrary to what it has done in the past. That is especially true because the reinsurance policy in this case expressly warrants that coverage is "[a]s [o]riginal" and that it will provide the "same gross rate, terms and conditions as and [will] follow the settlements of [ICSOP]." J. App'x 777, 779, 793, 796. Equitas therefore cannot confine its current obligations to what those obligations would have been had this dispute arisen fifty years ago.

*     *     *

This case unquestionably presents an issue that was expressly left open in *Wasa*, and has not since been resolved by the United Kingdom Supreme Court. We thus cannot be certain that our prediction as to how that Court would resolve this case had it been litigated in England is correct. But it remains our

42

responsibility to make our best considered judgment of how that Court would decide the issue, based on the available precedents.[8]

We have carefully reviewed those precedents, and for the reasons set forth above, we conclude that under English law the back-to-back presumption is strong, and we do not believe that the United Kingdom Supreme Court would condition that presumption on the importance of a policy term or the predictability of how a foreign court might later interpret that term. Accordingly, the back-to-back presumption applies to the reinsurance policy, thus rendering the parties' obligations co-extensive.

## B.     Late Notice of Claim

Separately, Equitas claims that ICSOP's failure to provide timely notice of claim allows it to fully repudiate the reinsurance policy. Equitas concedes,

---

[8] In certain domestic cases, where a federal court must decide an unsettled question of the law of a State, it is possible for that court to certify the question to the highest court of that State. *See, e.g.*, 2d Cir. Local R. 27.2(a) ("If state law permits, the court may certify a question of state law to that state's highest court."); 22 N.Y.C.R.R. § 500.27(a) (authorizing the New York Court of Appeals to review certain certified questions). No such procedure is available here, so we are left to our own reading of English law. *See Terra Firma Invs. (GP) 2 Ltd.*, 716 F.3d at 301 (Lohier, *J.*, concurring) (explaining that, "[i]n the context of cross-border commercial disputes, there is every reason to develop a similar formal certification process pursuant to which federal courts may certify an unsettled and important question of foreign law to the courts of a foreign country").

however, that timely notice is not a condition precedent to a claim for coverage under the reinsurance policy. Where timely notice is not a condition precedent, English law rejects the defense of partial repudiation – that is, an insurer's ability to reject a claim for coverage. *See Friends Provident Life & Pensions Ltd. v. Sirius Int'l Ins.* [2005] EWCA (Civ) 601 ¶ 32 (Lord Mance). That would seem to foreclose Equitas's more radical defense of *full* repudiation based on late notice of claim.

Nevertheless, Equitas's English law expert opines that on "extreme facts," "dishonest non-notification" that causes "serious prejudice to" an insurer might give rise to the defense of full repudiation of the contract. J. App'x 1189-90, ¶¶ 70-73. Conspicuously, neither he nor Equitas cite a case reaching that result, which would in any event sit in some tension with English law's rejection of a partial repudiation defense.

Even accepting for a moment the expert's proposed standard, however, the facts that Equitas alleges – that ICSOP notified Equitas some six years after becoming aware that a claim was likely under the reinsurance policy, that ICSOP failed to inform Equitas of the likely claim in response to queries about other claims, and that some of ICSOP's failures may even have been deliberate – do not suffice to show serious prejudice. Equitas's expert defined serious prejudice as

44

something that goes to the "root of the whole" contract. *Id.* at 1189-90, ¶¶ 68, 72. We see none of that in this record, and thus no reason to go where no English court has gone. Accordingly, we agree with the district court that Equitas's late-notice defense is unavailing.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.